UNITED STATES of America, Appellant,

v.

CHERKASKY MEAT COMPANY, Inc., Morris Cherkasky, Dora Cherkasky and Emanuel Cherkasky.

No. 12294.

United States Court of Appeals Third Circuit.

Argued May 16, 1958.

Decided Sept. 11, 1958.

Marvin C. Taylor, Washington, D. C. (Harold K. Wood, U. S. Atty., Philadelphia, Pa., George Cochran Doub, Asst. Atty. Gen., William M. Lytle, E. Leo Backus, Attorneys, Department of Justice, Washington, D. C., on the brief), for appellant.

Jacob Kossman, Philadelphia, Pa., for appellees.

Before McLAUGHLIN, KALODNER and STALEY, Circuit Judges.

STALEY, Circuit Judge.

Purely factual issues are presented by this appeal in a civil action brought by the United States for the recovery of double damages and forfeitures under the provisions of the False Claims Act, 31 U.S.C.A. § 231.[1]

1. "Any person not in the military or naval forces of the United States, or in the militia called into or actually employed in the service of the United States, who

From November 1, 1947, through October 31, 1950, the United States entered into 300 contracts or purchase orders with the defendant Cherkasky Meat Company, Inc.,[2] whereby defendant undertook to supply the armed forces with "boneless beef" from the carcasses of steers and heifers of the grade "U.S. Good" or better. "Boneless beef" is a product unknown in the civilian market. The bones and much of the fat are removed, and the meat is divided into three classes for shipment. The first consists of cuts for roasting and frying; the second, for braising and stewing; and the third consists of ground beef. By boning the meat, much shipping space is saved, and the resulting product is more readily usable at the army installation.

In his opening statement, counsel for the government informed the court that the Army received information from an anonymous source in November of 1950 that the Cherkasky company was defrauding the government by delivering boneless beef which did not conform to the contract specifications.

Further investigation led in 1953 to criminal prosecution of the company and two of its officers. They were acquitted of all charges.

On October 9, 1953, after the criminal trial was over, a civil action was commenced against the Cherkasky Meat Company, Inc., and the officers of the firm. The complaint charged a conspiracy among Cherkasky, four army Veterinary Corps inspectors, one civilian inspector employed by the government, and "diverse unknown persons." The alleged object of the conspiracy was to defraud the United States by obtaining or aiding to obtain payment of false or fraudulent claims. During the period of years in question the inspectors had supervised the work done for the Army at the Cherkasky plant and had inspected the carcasses, putting a stamp upon those which met with the contract specifications as steer or heifer, graded "U.S.Good" or better. The theory of the government obviously had been that the inspectors, in collusion with Cherkasky, had certified meat other than the class and grade specified in the contracts for delivery to the Army.

On the very first day of trial, however, the government dramatically moved to amend its complaint by striking the names of the inspectors as co-conspirators. Government counsel admitted that as to them he had no evidence on which to base the charges made in the complaint. Although the district court denied the government's motion because of its lateness, it did agree to accept as true that the inspectors were not implicated in any wrongdoing. As a consequence of the government's admission in that regard, it was then compelled to change its theory and attempt to prove that while the inspectors were honest and competent beyond reproach, nonetheless, through the fraud of the defendants, ineligible meat got into the Army shipments, and

shall make or cause to be made, or present or cause to be presented, for payment or approval, to or by any person or officer in the civil, military, or naval service of the United States, any claim upon or against the Government of the United States, or any department or officer thereof, knowing such claim to be false, fictitious, or fraudulent, or who, for the purpose of obtaining or aiding to obtain the payment or approval of such claim, makes, uses, or causes to be made or used, any false bill, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to contain any fraudulent or fictitious statement or entry, or who enters into any agreement, combination, or conspiracy to defraud the Government of the United State, or any department or officer thereof, by obtaining or aiding to obtain the payment or allowance of any false or fraudulent claim * * * shall forfeit and pay to the United States the sum of $2,000, and, in addition, double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit." 31 U.S.C. § 231.

2. The individual defendants, Morris Cherkasky, Dora Cherkasky, and Emanuel Cherkasky, were officers of the defendant corporation.

that this was made possible because there was an insufficient number of inspectors at the Cherkasky plant and because of overtime and week-end work not supervised by the inspectors.

The trial lasted fifteen days; fifty-two witnesses were introduced by the government, along with thousands of exhibits.[3] After hearing all of the government's evidence, the district court made findings of fact that the government failed to establish that defendants through fraud delivered substandard meat to the Army; further, it found that defendants had not presented false claims for payment. The complaint was dismissed and judgment entered for defendants.

The government urges that the findings of the district court were clearly erroneous.[4] It is the government's position that the character of the evidence was such that we should apply the rule stated in Dollar v. Land, 1950, 87 U.S. App.D.C. 214, 184 F.2d 245, 249, certiorari denied, 340 U.S. 884, 71 S.Ct. 198, 95 L.Ed. 641, where the Court of Appeals for the District of Columbia Circuit quoted with approval the following statement from the opinion of the Second Circuit in Orvis v. Higgins, 2 Cir., 1950, 180 F.2d 537, 539:

"Where a trial judge sits without a jury, the rule varies with the character of the evidence: (a) If he decides a fact issue on written evidence alone, we are as able as he to determine credibility, and so we may disregard his finding. (b) Where the evidence is partly oral and the balance is written or deals with undisputed facts, then we may ignore the trial judge's finding and substitute our own, (1) if the written evidence or some undisputed fact renders the credibility of the oral testimony extremely doubtful, or (2) if the trial judge's finding must rest exclusively on the written evidence or the undisputed facts, so that his evaluation of credibility has no significance."

In addition, we are told that the trial court disregarded the testimony of many witnesses who were not contradicted and whose testimony therefore should have been accepted.

The mere absence, however, of directly conflicting testimony given by witnesses of the opposing parties does not necessarily mean that the evidence in the record is devoid of those characteristics which require a trier of fact to evaluate it. Here, it is abundantly clear not only that a choice had to be made as to the meaning to be given certain equivocal testimony from the same witness, but the district court had to determine the probative value of the testimony of many witnesses where such evaluation could very well turn upon either the lack of opportunity to acquire knowledge of the fact, or the extent of the expertise of the witnesses who had expressed certain opinions. All of these circumstances appearing in this record indicate clearly that the trier of fact had something more to perform than an empty ritual.

The evidence of the plaintiff is divided by it into three classifications. The first is the invoices of Cherkasky's suppliers. The government introduced hundreds of these in an attempt to show from Cherkasky's purchases during the period involved that it would have been impossible for Cherkasky to have supplied the Army with meat of the class and grade specified in the contracts. The second classification is the testimony of Cherkasky's employees that they boned large quantities of *cows* which were ineligible under the Army contracts and that they worked on

---

3. The defendants did not put in any evidence.

4. The appendix printed by the government on this appeal is wholly inadequate. Our order of January 21, 1958, relieving the government of strict compliance with this court's rule as to the contents of the appendix, did not relieve the government from printing all material parts of the oral testimony. The court was compelled to read the original transcript, which comprised nearly 1800 pages of testimony, in order to understand properly the factual questions involved.

Saturdays, Sundays, and at other times in the absence of government inspectors. The third classification, closely related to the second, involves evidence of the opportunity to prepare ineligible meat for shipment in spite of the supervision of government inspectors whose honesty, competence, and good faith is conceded by the government.

Hundreds of suppliers' invoices were introduced into evidence by the government. Accountants of the F.B.I. tabulated all the invoices to demonstrate the government allegation that Cherkasky could not have supplied the Army with beef meeting the contract specifications because it did not purchase enough such eligible beef and, in fact, for the most part purchased beef which, because of class or grade, was ineligible. The tabulation was introduced into evidence in the form of a chart prepared many months before the trial. Although the district court permitted the introduction of the chart,[5] it obviously gave it little credence. The government now urges that this court may review this documentary evidence as well as the district court unhampered by Rule 52(a). It, however, ignores the fact that this was not purely documentary evidence. It even admits by brief that some of the invoices were equivocal in their description of the meat delivered, and oral testimony was necessary to explain the ambiguities. The evaluation of this oral testimony was surely for the district court. Furthermore, the accountant through whom the chart was admitted testified that his evaluation of the invoices as that evaluation appeared on the chart was based in many instances on what investigators who had interviewed suppliers told him. This is the rankest kind of hearsay based upon hearsay. The appellee points out that the chart shows that on one day there was not a single pound of eligible meat in the Cherkasky plant, even though there was a competent inspector at the plant every day. The appellee comments that the reason for this is that at the time the chart was prepared, the inspectors at the plant were considered conspirators with Cherkasky.

The chart was not competent evidence, but once introduced the district court properly accorded it little weight.

The testimony of employees of Cherkasky working as boners was introduced by the government to demonstrate that much of the meat prepared for the Army shipments was from ineligible cows, and that certain boning operations were performed on Saturdays, Sundays, and other times when the inspectors were not present. The carcasses received from the suppliers were graded by the inspectors at the plant and then broken down into smaller cuts for the boners to work on. The testimony of the boners that they could tell steer meat from cow meat in this form was in direct contradiction with the evidence of a government expert that it was virtually impossible to distinguish steer from cow after the carcass was cut up. From cross-examination it was obvious that some of the boners could not tell the difference between steer or heifer, and cow meat. The evaluation of this type of oral testimony was for the district court, and we cannot disturb its decision not to given credence to testimony exhibiting internal inconsistency.

The third problem posed for the plaintiff's case is how it could prove that so great a quantity of ineligible beef could have been delivered to the Army in the face of the fact that there was an honest and competent inspector in the Cherkasky plant every day of the period involved. The government had sought to prove that of the 23,000,000 pounds of beef purchased by Cherkasky for the Army contracts during the time in question, 14,000,000 pounds were ineligible. It would follow, the argument continues, that it would have been impossible for Cherkasky to have delivered eligible meat

5. At this point, it is relevant to comment that the government on this appeal has made no complaint about any ruling of the district court involving admissibility of evidence.

to the Army, inasmuch as it did not receive enough eligible carcasses to fulfill its commitments under the contracts.

■ The government tried to prove that one inspector at the plant was not enough, and that work was done by boners on Army contracts on week-ends when the inspector was not present. A report was attached to each shipment indicating how much beef had been rejected by the inspector at the plant. From the twelve reports in evidence, it was obvious that a not insubstantial amount of the beef inspected was rejected. One of the boners, furthermore, testified that on Saturdays he usually only cleaned bones, but occasionally he did bone meat about half a day on Saturday. The testimony given by the boners as to the opportunity afforded Cherkasky to substitute ineligible meat was again for the district court. With an opportunity to hear and evaluate it, that court rejected the testimony. With an admittedly competent and honest inspector in the Cherkasky plant every day, we find it inconceivable that more than 10,000,000 pounds of ineligible meat, out of a total of 16,000,000 could have been delivered to the Army. Although an inspector was at the Cherkasky plant for at least eight hours a day for most of the period involved, and about half a day for the last several months, there was not one single incident either brought to our attention by counsel or that we ourselves have found in the record to the effect that the government inspectors discovered any surreptitious substitution of sub-standard meat for the Army contracts. In the absence of such an incident being discovered, it is incredible that so mammoth a fraud as the government alleges could have taken place. Under the circumstances we cannot believe that more than sixty per cent of Cherkasky's operation involved processing and delivering incligible beef to the Army, even with whatever opportunity overtime and week-end work would have provided.

■ One final point remains. The government urges that a "confession of guilt" should arise in this civil case by virtue of the fact that defendants did not present evidence. Under certain circumstances, refraining from testifying or producing certain witnesses may lead to an inference that their testimony would have been unfavorable. But where the totality of plaintiff's evidence does not even spell out a prima facie case, no inference arises from the fact that defendants did not present evidence.

The judgment of the district court will be affirmed.