**STOWE TOWNSHIP**

v.

**STANDARD LIFE INSURANCE CO.
OF INDIANA.**

**Civ. A. No. 73–44.**

United States District Court,
W. D. Pennsylvania.

March 1, 1974.

Melvin Schwartz, Pittsburgh, Pa., for plaintiff.

William L. Standish, IV, Pittsburgh, Pa., for defendant.

## OPINION AND ORDER

SNYDER, District Judge.

This matter came before the Court for Non-Jury Trial on the Complaint of Stowe Township, originally filed in the Court of Common Pleas of Allegheny County, Pennsylvania, and removed by the Defendant to this Court. Jurisdiction of the litigation is under 28 U.S.C. § 1332, a diversity action where more than $10,000.00 is claimed. The Defendant filed an Answer denying that the Plaintiff was entitled to any relief. On February 14, 1973, the Plaintiff filed a Petition for Mandatory Injunction alleging that the Defendant's refusal to comply with a contractual responsibility relating to termination of a contract with respect to the funding of the Township's Pension Funds was causing the Township extreme hardship and requested a mandatory injunction be issued requiring the Defendant to pay over to the Plaintiff the balance of the Purchase Payment Fund alleged to be due under the contract. On February

16, 1973, Judge Joseph F. Weis, Jr. (now a Member of the Bench of the Third Circuit) held a conference with counsel; at which time all counsel requested a continuance of the hearing. This was granted, subject to a report to the Court when the parties were ready to proceed.

Upon Judge Weis' elevation to the Bench of the Third Circuit, this case was assigned to this member of the Court. In a conference held on May 15, 1973, the parties agreed that because of the complexity of the problem, the Court should determine whether the contract required on termination, the issuance of policies containing cash surrender values or the issuance of policies without cash surrender values. This determination would be made prior to pretrial. After the matter was thoroughly briefed, this Court, on July 27, 1973, D.C., 363 F.Supp. 341, determined that there was nothing in this contract which required annuities to be issued with cash surrender values. Further, since no cash surrender value was provided for in the contract, nor in the statutory provisions applicable thereto, it was the conclusion of this Court based upon the terminology of the contracts and the applicable law, that there was no right to demand a cash surrender value, or a policy containing such a provision.

A Status Conference was then held on August 16, 1973, at which time the Court established deadlines for the completion of Plaintiff's Pretrial Narrative Statement and Defendant's Pretrial Narrative Statement in light of the Court's determination. The Plaintiff's Pretrial Narrative Statement set forth the following order in which its proof would be offered: (a) that the Defendant Company through its authorized agents proposed to change the manner of funding the Township's Pension Funds by entering into a Deposit Administration Contract; (b) *that the value, benefits, and costs of the new plan would be equal to or more attractive than the Township's existing plans*; and (c) that the Plaintiff

Township was never advised by the Defendant Company that the annuity contract provided in the Deposit Administration Contract would not carry cash surrender value as had all previous annuity policies issued by the Company, nor that the balance of the fund would not be returned to the Township upon termination of the contract. The Plaintiff thus claimed either the cash surrender value of the policies or the return of its money.

The Defendant in its Pretrial Narrative Statement set forth that under the terms of the contract the Plaintiff was required to deposit with the Defendant the amounts actuarially necessary to fund the retirement annuity benefits provided for in the various pension plans. Termination of the contract could occur upon any one of three contingencies: (a) the payment of all annuity payments payable under the terms of the contract; (b) the termination of the Plaintiff's existence; or (c) the written notification to Defendant by Plaintiff of the termination of the contract. The contract further provided:

"If this Contract is terminated in accordance with Section I–1 the Company shall discharge its liabilities under this Contract by providing paid-up annuities to the participants in such amounts as they may be entitled to under the Plan as directed by the Employer. Such paid-up annuities shall be purchased with no less than 90% of the total amount held in the Purchase Payment Fund on the date of such termination." (Section I–2)

It appears by letter dated October 25, 1972, the Plaintiff notified the Defendant of the termination of the Contract, and thereafter demanded that the Defendant fulfill its obligation under Section I-2 of the Contract by issuing paid-up annuities carrying cash surrender values. In addition, the Plaintiff did not make any annuity payments to the Defendant after August 4, 1972. Defendant replied that it had offered to fulfill its obligations under Section I–2 of the

Contract by issuing paid-up annuities for the benefit of the annuitants covered by the Plaintiff's Pension Funds but had declined to pay to the Plaintiff any sum of money or to issue to the Plaintiff any paid-up contracts having cash surrender values.

Thus, the matter was submitted to a Non-Jury Trial on the allegations of the Plaintiff that under the circumstances of the funding and the Regulations of the Commonwealth of Pennsylvania Department of Insurance or the Auditor-General's Office, paid-up contracts were to be issued by the Defendant, which were required to carry a cash surrender value; or, that under all the circumstances and since the Defendant did not advise the Plaintiff that paid-up annuities would not carry cash surrender values, that, upon the termination of the Contract, the funds deposited pursuant to the Contract would be required to be returned to the Township. The amount actually deposited to the Contract was in the sum of $233,829.40 and to the extent that the Plaintiff is entitled to recover, such recovery would have to be limited to the aggregate cash value of paid-up annuities carrying cash surrender values of 90% of $233,829.40 or the sum of $210,446.46.

At the trial of the case the Plaintiff called for cross-examination Mr. James F. Bash, President of Standard Life Insurance Company of Indiana. Bash testified that his company had previously issued individual contracts to Stowe Township which carried cash surrender values. He testified that the instant Deposit Administration Contract (Contract) was initiated originally by having the Township execute an "Application for Group Annuity Contract" to signify their intention to purchase the Contract. As a result of the receipt of this Application, the Company then issued the Contract now before this Court, and the cash value of the prior individual contracts with Standard Life were credited by the Defendant Company to the new Contract.

Reference to the Application [1] shows only that Stowe Township was applying for a "group annuity contract". Plaintiff's Exhibit 1 shows the Defendant proposed to issue the Contract to fund the Police Pension Fund, Service Employees' Pension Fund and Board of Commissioners' Pension Fund under a pension and group insurance program, based on an assumption that the existing contracts would be converted and that the values of these contracts would be transferred to the Deposit Administration Group Annuity Contract (Contract). In such conversion, the Township was to receive full credit for the total reserves held by the Company with

---

[1]. STANDARD LIFE INSURANCE COMPANY OF INDIANA
APPLICATION FOR
GROUP ANNUITY CONTRACT

Application is made to Standard Life Insurance Company of Indiana, Indianapolis, Indiana, for a Group Annuity Contract.
By TOWNSHIP OF STOWE

Of 1301 Island Avenue—McKees Rocks, Pennsylvania 15136

The effective date of the contract shall be

It is agreed that acceptance of any contract issued shall constitute approval by the applicant of the provisions in such contract.
SIGNED AT McKees Rocks, Pa. THIS 24th DAY Of April, 1970.

TOWNSHIP OF STOWE

By s/ Irene Cairns

Secretary

Soliciting Agent s/ J. J. Markotan C. A.

(Title)

no surrender charges.[2] Under the stated "Principles Of Operation" of the Proposal, it was set forth:

"The Deposit Administration contract is a contract between the Township of Stowe and Standard Life Insurance Company providing for the accumulation of funds to purchase pensions for members who retire in accordance with the Township's Pension Plan. The contributions to the Plan are accumulated at interest and are not allocated to specific individuals until their actual retirement."

Certain provisions were proposed for the safety of the deposit funds by a guarantee by the Defendant that the funds deposited would not be impaired by investment losses. A minimum interest rate of 6¼% compounded annually for the first year was to be credited to the deposits held by the Company. The Township was to be informed of the guaranteed rate at the time of such deposit.

It was also stated as part of the proposal that "when an employee retires under the plan, an annuity will be purchased for the employee by withdrawal of the amount required to purchase his pension from the Deposit Fund. * * " A specific schedule of benefits for each named policeman was proposed, including the eligible retirement age, the monthly pension which was to be integrated with Social Security and a Death Benefit of $10,000.00.

On March 1, 1970, the Plaintiff and the Defendant entered into the Contract, issued in consideration of the Application by the Township, and of the payment in advance of a consideration to the Purchase Payment Fund (Fund) and further payments to the Fund as provided in the Contract.[3] By definition, "Fund" referred to the sum of all of the employer's deposits plus interest and dividends less the withdrawals, charges, and deductions as authorized in the Contract. The Company was not required to segregate specific assets or allocate them to the Fund and "no employee shall have any vested or contingent legal or equitable interest in the fund and the Company may use the fund for any Retirement Annuities or other Benefits as defined in Section A–10 for any Participant or their beneficiaries even to the exhaustion thereof without liability to any Participant or any other person." (See Section A–9.)

2. Board of Commissioners
Township of Stowe

Re: Police Pension Fund
Service Employees' Pension Fund
Board of Commissioners Pension Fund

Gentlemen:

In accordance with your request we are proposing a Pension and Group Life Insurance program for all full-time employees and members of the Board of Commissioners of Stowe Township. Our calculations are based on the assumption that the existing individual contracts are converted and that the values from these contracts will be transferred to a Deposit Administration Group Annuity Type Contract.

In such conversion, the Township will receive full credit for the total reserves held by the Company with no surrender charges. The basic explanation of the Deposit Administration Group Annuity Contract is shown on the following pages.

J. J. MARKOTAN & CO

————◆————

3. The application by plaintiff for "Deposit Administration Group Annuity Contract" was made on April 24, 1970; both Plaintiff and Defendant agreed that the effective date of the contract would be March 1, 1970. The reasons for this procedure are set forth in the testimony of Mr. Bash. (See Tr. pp. 18–23.)

As to the Fund, it was provided that the deposits would be such as would be recommended by the Defendant's Actuary to fund the benefits provided by the Plan (the Township of Stowe's Pension Plan for Police and Service Employees and Board of Commissioners' employees). The net deposits received by the Defendant were to be credited to the Fund; net deposit being defined as gross deposit less an expense charge of 5% of the amount so received. The Contract specifically provided for credits to the Fund from the net deposits, from the interest at the contract rate, and from dividends, if any; withdrawals were provided for "amounts sufficient to purchase retirement annuities at the rates then applicable under the terms of this Contract", to provide disability benefits, to provide for termination benefits, to provide for any other benefits under the Plan, and "Withdrawals to provide paid-up annuities arising from the termination of the Plan and/or termination of the Contract." In addition, a provision was made for "Debit to the Purchase Payment Fund for any expenses incurred by the Employer [Township] in connection with the final termination of this Contract as provided in Section I." The Company reserved the right to amend the Contract on the fifth anniversary of its date of issue and as of every subsequent anniversary by giving ninety days notice to the Employer as to "(a) Any and all of the schedules, [and] (b) The contract rate of interest".

Termination was provided for as follows:

"This Contract shall terminate:

(a) as of the date on which there ceases to be any further annuity payments payable in accordance with the terms of this Contract; or

(b) as of the date on which there ceases to be any Employer; or

(c) *as of the date specified by the Employer in a written notice to the Company.*" (Emphasis supplied.)

In his testimony Mr. Bash was careful to delineate the difference between individual contracts and group contracts as follows:

"The individual contracts, at least by and large the ones that we issue, the individual contract, as a differentiation from the group contract, the premium structure would be entirely different.

It is based on one life as against the probabilities or the multiple lives.

The individual contract would also provide for the disposition of any benefits that would accrue under it, whether during the accumulation period or during the retired period.

The group contract, on the other hand, is the premium based on the sum total of the various lives involved and a projection probably of their expected mortality and factors of that nature." (Tr. p. 46.)

Mr Bash went on to explain that under the group policy the premium is, in effect, recalculated each year according to the salary schedules, the number of people who are involved, and their age changes. It is an annual premium calculation as against a set premium that is payable for a term of years as under an individual contract. The group annuity was calculated on the basis of purchasing a set, fixed benefit each year while the Deposit Administration Contract was based on what would be needed under the information provided by the employer and thus setting up annuity benefits that would be payable at some date in the future. Since the purpose of the Plan was to provide retirement benefits, there was no provision whereby the money, once having been used to purchase benefits for employees of Stowe Township, could be required by Stowe Township to be returned to it. This particular provision was not brought to the attention of Stowe Township by Mr. Bash, nor did he ever advise the Township that there was *not* a cash surrender value.

Mr. Bash explained in detail that the Company would not be willing to enter

into a Deposit Administration Contract involving a substantial funding to the Purchase Payment Fund with a guarantee of returning cash at the termination of the contract because it was part of the philosophy of the Company not to enter into a contract that would require, at some ascertained future time, a large cash refund. This was based largely upon the intent to assume only long term obligations in which there can be a reasonable estimate of the cash requirements over the intervening years. If they were to have contracts outstanding in any volume, that could call for an immediate large cash disbursement, then they would be subject to a demand that did not fit into the investment situation. Comparing this with individual annuity contracts, the cash surrender value can and should be built into the premium structure as an anticipated percentage of the total contracts outstanding.

Counsel for the Plaintiffs brought out that the ten percent termination fee was a penalty for terminating even though no money was going to be given back. The penalty was because it was changing the purpose and intent of the Contract which was to provide benefits for the employees in accordance with the terms of the Plan.

## I. FINDINGS OF FACT.

1. Prior to the issuance of the Deposit Administration Contract, the subject matter of this suit, the Plaintiff had entered into agreements with the Defendants whereby benefits in the form of individual deferred annuity contracts and life insurance policies were provided to establish the pension benefits of certain of the Township's employees.

2. These policies were owned by the Township, were subject to its direction and control, and contained the privilege to exchange or surrender said policies for their cash values.

3. On April 24, 1970, upon the recommendation of the Defendant's Pittsburgh Agent, J. J. Markotan, the Township changed the form of funding its Pension Plan by making application for a group annuity contract and the Defendant responded by issuing the Deposit Administration Contract, the subject of this suit.

4. Under this Agreement the individual annuities previously held by the Township were, in fact, surrendered and their reserve values applied to cover the initial cost of the substituted plan.

5. On June 30, 1972, the Stowe Township Board of Commissioners notified the Defendant that in accordance with the termination provision of the Deposit Administration Contract (Contract), the Township was terminating the Agreement.

6. On October 25, 1972, after previous letters of August 4, 1972 and August 17, 1972, a specific demand was made under Section I–2 of the Contract for a settlement to be made from the 90% of the Purchase Payment Fund to be applied toward the purchase of the individual paid-up annuity policies and that the policies issued be single premium deferred annuities to be apportioned equally between the listed Participants.

7. The Defendant resisted the Township's demands on the basis that the Deposit Administration Contract failed to provide for cash surrender values for the annuities and continued to the time of trial to contest the right of the Township to receive annuities with paid-up cash surrender values or to receive any cash, offering only to provide paid-up life deferred annuity policies.

8. Although the Plaintiff was the previous owner of annuity policies issued by the Defendant containing cash surrender values, upon the Defendant Company's suggestion, the Deposit Administration Contract was substituted. There was no explanation by the Company as to the material changes affected under the new agreement, including the loss of cash surrender values to the plaintiff.

## II. DISCUSSION.

From the testimony presented at the hearing, although very sketchy,[4] the Court can only come to the conclusion that there was a substantial change made in the type of policy which the Defendant issued for the purpose of funding the Plaintiff's various pension funds, with no explanation of the changes being given.

The Plaintiff has cited to this Court numerous cases involving changes in policies. For example, Schock v. Penn Township Mutual Fire Insurance Association, 148 Pa.Super. 77, 24 A.2d 741 (1942). In that case the plaintiff had owned a fire insurance policy for a ten year term and upon expiration, the insurance company sent another ten year policy without notifying the plaintiff that a change had been inserted whereby there was a reduced coverage as compared to the previous policy. The Court held that the plaintiff was entitled to full coverage finding that the insurance company had an affirmative obligation to make its intentions evident to its insured to whatever extent it intended to alter the terms of the agreement. Having failed to do so, the Plaintiff's recovery rights were construed as identical to those of the previous policy. The Court further held that the failure to read or study the new policy on the part of the insured was no defense to the neglect of the insurer to notify the insured of the alternations in the policy. See also, Bauman v. Royal Indemnity Co., 36 N.J. 12, 174 A.2d 585 (1961) where at page 592 the following appears:

". . . . . common fairness as well as legal duty dictated that it call the lessened coverage to the attention of the insureds so that they might suitably protect themselves."

To the same effect, Old Overholt v. Reliance Ins. Co. of Philadelphia, 319 Pa. 340, 179 A. 554 (1935); Burson v. Fire Ass'n of Philadelphia, 136 Pa. 267, 20 A. 401 (1890).

The Defendant argues that the Plaintiff has not met the burden of proof set forth in the above cases in that they were all based on reformation of an insurance policy when an alternation in the coverage was made in the course of an apparent renewal. They contend that in order to reform the Contract the Plaintiff must prove by clear and convincing evidence: (and have totally failed to do so) (1) mutual mistake of the parties; (2) unilateral mistake by one party coupled with fraud on the part of the other party; or, (3) the terms of the preceding agreement which the contract was intended to embody. The defendant relied on the law as set forth in Seaboard Radio Broadcasting Corp. v. Yassky, 176 Pa.Super. 453, 107 A.2d 618 (1954); Marmon Philadelphia Company v. Blocksom, 103 Pa.Super. 542, 157 A. 510 (1931), and Armstrong County Building and Loan Ass'n v. Guffey, 132 Pa. Super. 19, 200 A. 160 (1938). They further state that these elements are specifically required for reformation of insurance policies in Pennsylvania under the principles of law as set forth in Equitable Life Assur. Soc. v. Saurman, 126 Pa.Super. 184, 190 A. 422 (1937); and Boyce v. Hamburg-Bremen Fire Ins. Co., 24 Pa.Super. 589 (1904). Thus, the Defendant would have this Court limit the rule with respect to the duty on the Company to notify of changes to those situations where the contract was a renewal of an earlier contract and where the insurance company failed to notify the insured that the new policy contained different terms from the policy being renewed. But in this, the Court believes, the Defendant has misconstrued where the duty lies.

 Under the evidence in the case, while there was not a renewal, there was a complete substitution of a new concept of funding of the Pension Funds represented to the Township by the Insurance Company to be adequate to the stated purposes of the Funds. Where

4. The Plaintiff rested after calling Mr. Bash and the Defendant offered no testimony.

the policies contained the prior provision for cash surrender values and the new policy did not, there was a substantial change made in the relationship between the Plaintiff and the Defendant.

The evidence here revealed that prior to the execution of the Contract in suit, the Township had purchased a number of individual life insurance policies and individual annuities for certain of its employees from the Defendant Company. These were individual policies, each issued on a specific employee and contained cash surrender values. All these individual policies on the different employees were "cancelled" and the reserves attributable to them were used as purchase payment deposits under the Contract in suit. While the entire thrust of the change in funding was to do away with the old policies and annuity contracts and to cover the pensions and benefits which they contained for the employees through the Deposit Administration Contract, and while this could in no sense be called a renewal or extension of an existing policy, there was a very definite continuation of the relationship between the Plaintiff and the Defendant which required the differences and distinctions between these contracts to be explained to the Plaintiff. It is clear from the testimony that no such explanation was made.

The Defendant contends that the Plaintiff failed to meet the burden of proving that the Insurance Company did not notify the purchaser of the *difference* between the old policies and the new policies. (The difference in question, of course, was that the new contracts did not provide for cash surrender values for the paid-up annuities to be furnished on termination of the Contract.) It is true that the Plaintiff did not call anyone to give testimony other than the President of the Defendant Company, who said in effect that he did not know what his agent may or may not have said. The Plaintiff did not call the Com-

missioners to show that the explanation of the change had not been made. But it is just as true that the Defendant, although its agent was present in court, chose to rest its case without offering any testimony. We do have on the record in the letter of August 17, 1972, (attached to the Complaint) the fact that the Board of Commissioners had made two former requests for liquidation of the contract on defendant company, and the tender of such requests shows no such explanation that the paid-up annuities would have no cash surrender value. The only inference that the Court can draw with the limited record before it is that no explanation of this change was made to the Plaintiff or its representatives.

■ We, therefore, find that the Plaintiff is entitled to paid-up annuity contracts and, thus, it is not necessary that we reach the contention of the Plaintiff that if the contract was not construed to require paid-up annuity contracts then that such contracts would be contrary to public policy.[5]

However, having reached the conclusion that the Plaintiff was entitled to contracts calling for a paid-up cash surrender value, the matter before us still poses some difficulty because of the testimony of the President of the Defendant Company presented in the Plaintiff's case when called for the purpose of cross-examination. At that time he stated that the issuance of such policies would be completely contrary to the method of operation of the Defendant Company. It would seem that under the Plaintiff's own testimony, the most equitable solution is a return of the money which has been deposited with the Insurance Company, specifically the Purchase Payment Fund less the amount of the termination provision of 10%, that amount to bear interest at 6% per annum from October 25, 1972 until paid.

An appropriate order will be entered.

---

5. The Plaintiff offered no evidence nor cited any law to the Court that there were any applicable Statutes or Insurance Department Regulations requiring group annuities to carry cash surrender values.