**STOWE TOWNSHIP, Appellee,**

v.

**STANDARD LIFE INSURANCE COMPANY OF INDIANA, Appellant.**

No. 74–1409.

United States Court of Appeals, Third Circuit.

Argued Dec. 12, 1974.

Decided Jan. 24, 1975.

---

See also, D.C., 363 F.Supp. 341.

William L. Standish, William H. Powderly, III, Alan G. Keith, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for appellant.

Melvin Schwartz, William A. Johnson, Cooper, Schwartz, Diamond & Reich, Pittsburgh, Pa., for appellee.

Before ALDISERT, ADAMS and HUNTER, Circuit Judges.

**1334**

## OPINION OF THE COURT

ADAMS, Circuit Judge.

The issue presented on this appeal is whether the plaintiff made out a prima facie case to reform a group annuity contract. We conclude that insufficient evidence was produced to sustain the finding of reformation, and consequently vacate the judgment of the district court, 372 F.Supp. 433.

a.

To secure retirement benefits for its municipal employees and commissioners, plaintiff Stowe Township, prior to 1970, entered into a series of individual deferred annuity policies with the defendant Standard Life Insurance Company of Indiana. Each individual annuity policy contained, inter alia, a provision for cash surrender value on termination.

In 1970, an agent of Standard Life, Mr. Markotan, recommended a new group contract of the deposit administration type to replace the individual policies as a means of funding and implementing Stowe's retirement plan. Stowe thereupon entered into the group annuity contract which is the basis of the present action. Under the group contract, Stowe deposited funds with Standard Life and, subject to certain adjustments to the pool of money thus created, Standard Life was to provide individual annuities to Stowe's employees and com-

missioners as their retirements occurred.[1] The new group contract did not in explicit terms grant cash value on termination. When the new group plan became effective, the individual policies were cancelled and reserve monies under the individual contracts were applied to the new group fund.

In 1972 Stowe terminated its group contract with Standard Life, and demanded that, pursuant to the termination clause,[2] Standard Life issue individual paid-up deferred annuity policies for named municipal personnel. Also, as part of its demand, Stowe insisted that the new individual policies "have cash values the same as previously issued policies of the same type."[3] In response to Stowe's demand, and in conformity with the terms of the group contract, Standard Life agreed to issue paid-up deferred annuities, but refused to include a provision for cash surrender value.

Maintaining that the group contract should be either construed or reformed to provide for policies with cash surrender value clauses, Stowe filed suit in the Common Pleas Court of Allegheny County. Based on diversity of citizenship, the suit was removed to the United States District Court for the Western District of Pennsylvania. 28 U.S.C. §§ 1332, 1441(b), 1446. Both parties concede that the law of Pennsylvania governs the dispute.

---

1. The operation of the deposit administration plan included creation of a purchase payment fund, a protected interest-bearing investment account, to which Stowe's periodic payments were credited (less a 5% service charge). The amounts Stowe paid were those that Standard Life deemed actuarially necessary to meet the Township's ultimate retirement benefit costs. As an employee under the plan retired, an amount was withdrawn from the payment fund and used to purchase a monthly annuity from Standard Life.

2. The relevant contract provision reads:

 Section 12. *Termination of Contract*
 If this contract is terminated in accordance with Section 11, the company [Standard Life] shall discharge its liabilities under this contract by providing paid-up annuities to the participants in such amounts as they

may be entitled to under the Plan as directed by the employer [the Township]. Such paid-up annuities shall be purchased with no less than 90% of the total amount held in the Purchase Payment Fund on the date of such termination.

Under the termination clause as Stowe would have it reformed, the Township would immediately receive the cash value of its deposits. Under Standard Life's interpretation, Standard Life would retain the funds, continuing to invest them and granting Stowe no less than 5% interest, until such time as the Fund was exhausted by the withdrawal of annuities.

3. Letter of Oct. 25, 1972, from Secretary and Solicitor of the Township to Standard Life. Trial Exhibit 3 (erroneously listed in the table of exhibits as a letter dated Oct. 5, 1972), 144a, 185a, 199–201a.

The district court held before trial that the group contract as written did not include a right to cash surrender values upon termination, nor did Pennsylvania law superimpose such a provision onto a contract of this sort. Neither party has questioned this holding. Accordingly, to create a cash surrender value provision in the group contract would require a reformation of the group contract. The principal thrust of Stowe's position was that the insurance agent had proposed the group contract to Stowe as a change in its manner of funding retirement benefits. In its pretrial narrative, Stowe alleged that Standard Life had made assurances that the value and costs of the new group plan would be at least as attractive to Stowe as the individual policies it replaced. Also, Stowe asserted that under these circumstances Standard Life had a duty—which it had breached—to advise Stowe that the group contract would not carry cash surrender values upon termination. In effect, Stowe contended that the group contract should be reformed to incorporate the cash surrender provisions from the previous individual contracts.

In response, Standard Life insisted that no such duty to explain existed where, as here, a group contract embodying a wholly new concept of administering and funding a retirement program was substituted for a series of individual annuity contracts. The situation presented here, claimed Standard, was not a renewal.

At the non-jury trial that ensued, Stowe presented as its sole witness Mr. Bash, President of Standard Life, and interrogated him as on cross-examination. On the issue of advice by Standard Life to Stowe regarding the absence of cash surrender value for the group policy, the following colloquy occurred:

MR. SCHWARTZ:

Q. Well isn't it true, Mr. Bash, that the prior policies had cash value?

We have gone through this once before, is that correct?

MR. BASH:

A. Yes.

Q. Isn't it also true that you never advised, you, being the company, and to your knowledge never advised the Stowe Township Commissioners that once they switched these policies, there would never be any way for them to get the money back?

A. And I am saying that I would imagine in the discussions that the agent would have, that question very logically could have come up.

* * * * * *

Q. You never advised them either collectively or individually, did you, Mr. Bash?

A. I cannot say to you what the agent may or may not have said to them.

Q. I am not interested in what the agent may or may not have said. I am interested in what you know personally and what you did personally.

A. I don't know that, and I have answered that question, I believe, that so far as myself personally, so far as the home office is concerned, I don't believe that they were ever—that there was ever any contact between the company and the borough or the township, excuse me.

Trial transcript 58–59.

Two exhibits were introduced by Stowe: an application on behalf of the Township for a group annuity contract solicited by the agent, Mr. Markotan, and a letter of October 25, 1972 from Stowe to Standard Life demanding termination arrangements satisfactory to the Township, and reflecting the Township's expectation that the policies carried cash surrender values.[4]

---

4. It is contended by Stowe Township that two earlier letters from Stowe to Standard Life, appended to the complaint and referred to in the October 25, 1972 letter, were incorporated into evidence by reference. Standard Life vigorously asserts otherwise. See Bracey v.

Following Mr. Bash's testimony, Stowe rested. Standard Life elected to present no defense. Mr. Markotan was in the courtroom but was not called by either party. No person who had actually participated in the agreement, or in any preparatory negotiations, was requested to give evidence with respect to any assurances or explanations from any agent of Standard Life regarding the operation of the group contract.

By opinion and order dated February 28, 1974, the district court concluded that:

> [W]hile this could in no sense be called a renewal or extension of an existing policy, there was a very definite continuation of the relationship between the Plaintiff and the Defendant which required the differences and distinctions between these contracts to be explained to the Plaintiff. It is clear from the testimony that no such explanation was made. (District court opinion at 440 of 372 F.Supp.)

The district court found for Stowe, predicated on two conclusions. First, the court determined that, as a matter of law, where one insurance plan evolves from another, an insurer is under a duty to explain any differences in benefits on pain of being held to the more generous benefits of an earlier contract; and, second, that a sufficient showing had been made in this case that the insurer had not explained any differences in the benefits.

### b.

Under Pennsylvania law, reformation of an insurance contract is possible where written conditions are changed without any explanation by the insurance company or its agents.[5] In particular, when an insurance renewal contract curtails benefits from those provided by the original insurance policy, insurers have been held to the terms of the original policy.[6]

In the insurance renewal cases relied on by the district court, it was established beyond doubt that the new policies were held out as otherwise unaltered versions of original policies. Thus, in Overholt v. Reliance Insurance Co., a leading case, the Pennsylvania Supreme Court declared:

> When the defendant company inquired through its agent whether the policy was to be renewed, this was an offer to make a new contract. In the absence of circumstances to indicate that a different meaning was intended, this meant a contract chronologically "new," but in *form* and *substance,* identical with the original; no other interpretation is reasonable and can be maintained.[7]

In the situation here, however, presuming that the facts were established as alleged, application of the renewal rule would constitute an extension of that rule beyond its traditional ambit. Although admittedly to effectuate the same goal as the earlier agreements,

---

Grenoble, 494 F.2d 566, 570 n. 7 (3d Cir. 1974). Even were we to assume, *arguendo,* that the earlier letters may be considered, they provide only cumulative corroboration of the Township's belief, expressed in the October 25 letter, that it was entitled to cash values. They contain no references to the failure of Standard Life, or its agents, to warn of the difference in terms. Consequently, consideration of the additional letters would not change the result.

A copy of a brochure entitled "Stowe Township Pension Fund," dated March, 1970, and ostensibly prepared by Markotan & Co., was not admitted into evidence pending its proper identification; such identification was not forthcoming.

5. General Electric Credit Corp. v. Aetna Casualty & Surety Co., 437 Pa. 463, 263 A.2d 448 (1970) (reformation ordered to insert an omitted lender's loss clause where an affirmative request by the lender had been agreed to by insurer).

6. Overholt v. Reliance Ins. Co., 319 Pa. 340, 179 A. 554 (1935); Burson v. Fire Insurance Co., 136 Pa. 267, 20 A. 401 (1890); Schock v. Penn Twp. Mut'l Fire Ins. Ass'n, 148 Pa.Super. 77, 24 A.2d 741 (1942).

7. 319 Pa. at 344, 179 A. at 556–557 (emphasis in original).

here a totally new plan was adopted; there was no mere renewal.

While it is thus open to question whether under the facts alleged a Pennsylvania court would conclude that reformation was permissible, we do not reach the issue of the correctness of the district court conclusion in that regard. For, even assuming the legal principle enunciated in the district court opinion to be compatible with Pennsyvania law, inadequate evidence was presented to sustain the judgment in any event.

In the insurance renewal cases, the crucial elements were the existence of the first policy and the terms of its coverage; the renewal; the lessened coverage of the second policy; and finally, evidence regarding the lack of warning by the insurance company about the diminished protection. In the present case, the existence and scope of coverage of the two contracts are admitted. However, even under its own view of the law, in order to prevail in its reformation attempt, Stowe was obliged to submit, as part of its prima facie case, evidence to prove that the company failed to disclose the absence of cash value in the group contract. No evidence was forthcoming about representations alleged to have been made by Standard Life's agent to the effect that the new plan would be as attractive as the program for which the group plan was substituted. Also, there was no proof that

no disclosure had been made to the Township regarding the absence in the group plan of cash surrender value on termination.[8]

■■■ In Pennsylvania a party seeking to reform a contract must generally present "clear, precise and convincing"[9] evidence demonstrating the basis for reformation. In the Pennsylvania insurance renewal cases referred to above, the courts have had before them evidence which satisfied this standard.[10] Whether the evidence offered in this respect discharged Stowe's burden of proof is a question of law subject to review.[11]

As noted, no direct proof was offered to show the truth of the material allegations made by the Township. To compensate for this vacuum the district court placed weight on the failure of Standard Life to offer the testimony of the agent Mr. Markotan. But, while a permissible inference is ofttimes drawn where a party declines to offer testimony from a witness within its control who would reasonably be expected to corroborate its position,[12] imputing significance here to the absence of testimony from the agent misapprehends applicable Pennsylvania law.

■■■ The inference permissible from a failure of a witness to testify will not do service for establishment by the plaintiff of facts sufficient to make out its prima

8. In *Burson, supra* note 6, the uncontradicted evidence was that the insurance agent, in reviewing a policy, had said, "I will make you another policy like the first one," and the court held, under these circumstances, that the agent had a duty to disclose any changes in conditions. In *General Electric Credit Corp., supra* note 5, an attorney who had affirmatively requested a lender's loss clause in an insurance contract testified that he was given assurances of its inclusion, and that other GECC contracts entered into at the same time contained such clauses. Based on these two items of evidence, the court held that the quality of proof sufficed to grant reformation.

9. *General Electric Credit Corp., supra* note 5, (reformation ordered); Easton v. Washington County Insurance Co., 391 Pa. 28, 137 A.2d

332 (1958); Bayout v. Bayout, 373 Pa. 549, 96 A.2d 876 (1953) (deed, not reformed); Brandolini v. Grand Lodge of Penna., Order Sons of Italy in America, 358 Pa. 303, 56 A.2d 662 (1948) (construction contract, not reformed).

10. Notes 6 and 7 *supra*.

11. *Easton, supra* note 9; *Bayout, supra* note 9. In both cited cases judgments for plaintiffs were reversed for insufficiency of evidence as a matter of law.

12. Alexander v. Wilkes-Barre Anthracite Coal Co., 254 Pa. 1, 98 A. 794 (1916); *Brandolini, supra* note 9; *Bayout, supra* note 9; United States v. Cherkasky Meat Co., 259 F.2d 89 (3d Cir. 1958). 29 Am.Jur.2d Evidence § 180; McCormick, Handbook of the Law of Evidence § 272 (2d ed. 1972); 31A C.J.S. Evidence § 156(3).

facie case.[13] Indeed, there is support in Pennsylvania for the view that where the plaintiff has not presented adequate evidence, the unexplained absence of testimony by witnesses on plaintiff's behalf gives rise to an inference more damaging to plaintiff than whatever benefit it might derive from the failure by defendant's agent to take the stand.[14] No reason was suggested to account for the Township's failure to produce its Commissioners, its Solicitor, or its Secretary, all of whom might have testified. And finally, whatever inference might otherwise be available from the failure to call a witness is not permissible when a defendant chooses to put on no evidence at all, in apparent reliance on its determination that plaintiff has not met its burden.[15]

■ In Raffaele v. Andrews,[16] the Court expressed the view that it was only where a party, having the burden of proof, declined to bring forward an appropriate witness to discharge its burden that an inference could be supported against it. Where, by contrast, a party has no burden to meet, an adverse inference may not properly be drawn against it for failure to produce evidence.

c.

■ Since we conclude that the Township has not marshalled adequate evidence to satisfy the burden of proof required to reform its contract with Standard Life, the judgment of the district court will be vacated and the proceedings remanded for entry of a judgment for the defendant.

13. Eckenrode v. Pennsylvania R. Co., 164 F.2d 996 (3d Cir. 1947); Transcontinental Gas Pipe Line Corp. v. Mobile Drilling Barge, 424 F.2d 684 (5th Cir. 1970). McCormick, *supra* note 12; 31A C.J.S. Evidence § 156(3) states:

> Any inference drawn from such failure is not equivalent to direct evidence; it does not take the place of evidence of material facts, or shift or satisfy the burden of proof so as to relieve the party on whom rests the necessity of establishing a prima facie case . . .. (footnotes omitted)

This would apply more forcefully where, as here, the requisite standard of proof is high. *See e. g., Bayout, supra* note 9.

14. *Bayout, supra* note 9.

15. *Cherkasky, supra* note 12; Raffaele v. Andrews, 197 Pa.Super. 368, 178 A.2d 847 (1962). Am.Jur. *supra* note 12; C.J.S., *supra* note 12.

16. *Supra* note 15.