

Opinions of the United
States Court of Appeals
for the Third Circuit

12-14-1995

# Brewer v. Quaker State Oil Rfng. Corop.

Precedential or Non-Precedential:

Docket 95-3101

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"Brewer v. Quaker State Oil Rfng. Corop." (1995). *1995 Decisions.* Paper 307.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/307

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-3101


JUDSON C. BREWER,
                              Appellant
                 v.

QUAKER STATE OIL REFINING CORPORATION;
      QUAKER STATE CORPORATION


On Appeal from the United States District Court
   for the Western District of Pennsylvania
            (D.C. No. 93-cv-00072E)


Argued October 19, 1995
BEFORE:  SCIRICA, COWEN and ROTH,
              Circuit Judges

(Filed December 14, 1995)

Samuel J. Cordes (argued)
Ogg, Jones, DeSimone & Ignelzi
245 Fort Pitt Boulevard
Pittsburgh, PA  15222

          COUNSEL FOR APPELLANT
          Judson C. Brewer

Peter D. Post (argued)
Robert B. Cottington
Reed, Smith, Shaw & McClay
435 Sixth Avenue
Pittsburgh, PA  15219-1886

          COUNSEL FOR APPELLEE
          Quaker State Oil Refining Corporation;
          Quaker State Corporation

Robert J. Gregory
Room 7032
Equal Employment Opportunity Commission
1801 L Street, N.W.

Washington, D.C.  10507

            COUNSEL FOR AMICUS-APPELLANT
            Equal Employment Opportunity Commission


                            **OPINION**


COWEN, <u>Circuit Judge</u>.

        Plaintiff-appellant Judson C. Brewer appeals the
district court's grant of summary judgment in favor of his
employer, Quaker State Oil Refining Corporation and Quaker State
Corporation ("Quaker State"), on Brewer's Age Discrimination in
Employment Act ("ADEA") claim, 29 U.S.C. § 623 (1988), and the
dismissal of his pendent state-law claim brought under Michigan's
anti-discrimination statute, the Elliott-Larsen Civil Rights Act,
Mich. Comp. Laws § 37.2101-2804.  Because the record reflects a
genuine issue of material fact regarding whether Quaker State's
asserted nondiscriminatory reasons for discharging Brewer are
pretextual, we will reverse the district court's entry of summary
judgment in favor of Quaker State and remand the matter for
further proceedings.


                              I.

        Brewer worked for Quaker State as a sales
representative from 1968 until the time of his discharge in March
1992, at the age of fifty-three.  He worked in the Pittsburgh
office until it closed in 1989.  During the course of his
employment in Pittsburgh, Brewer was supervised by two different
division managers, Bruce Drummond and Michael O'Donnell.  During

                              2

their respective tenures, both Drummond and O'Donnell encountered certain problems with Brewer's performance. For example, Drummond stated that Brewer's clients complained that they had run out of oil or had not seen their sales representative in some time. In January 1989, O'Donnell placed Brewer on a ninety-day probation for similar performance deficiencies, including customer complaints about running out of oil, poor follow-up with projects, inaccurate and incomplete paperwork, short work days, and lack of organization. Shortly after Brewer completed his probationary period, he was transferred to the Detroit division.

District Manager Paul Pfauser supervised Brewer in Detroit. In 1990 Pfauser gave Brewer acceptable performance ratings, but criticized him for poor planning. Pfauser advised Brewer that he needed to work more closely with his client accounts and set higher standards for himself. At the end of 1990 Brewer received a sales bonus for exceeding the company's sales quota for that year.

In May 1991, shortly before his second annual review under Pfauser's supervision, Pfauser notified Brewer that various facets of his performance required improvement. Pfauser counseled Brewer to be more efficient, to follow-up with requests both from his customers and from management, and to improve the timeliness and completeness of his sales reports. In his formal evaluation in June 1991, Brewer received marginal or unacceptable ratings in all categories.

In August 1991, Brewer was placed on a ninety-day probation for his performance deficiencies. At that time,

3

Pfauser criticized Brewer for performing poorly in the areas of client communications and organization. In December 1991, Brewer again exceeded the company's sales quota and received another bonus. Brewer was the only salesperson in the Detroit region to receive such a bonus for both 1990 and 1991.

Brewer's personnel file for the years prior to 1990 was lost. However, it is not disputed that Brewer's mean performance evaluation rating from 1987 through 1990 was "3" out of a possible "5", which translates into "competent" by Quaker State's performance standards. Factoring in his evaluation for 1991, Brewer's overall average for 1987 to 1991 was 2.9.

At the end of the ninety-day probation, Pfauser repeated his concerns that Brewer was spending too little time in his territory and not adequately communicating with customers. At this time Brewer's probationary period was extended for an additional sixty days. On February 18, 1992, Pfauser wrote a memorandum to Brewer documenting performance problems, including Brewer's misprocessing orders, and failure to advise his accounts of credit problems.

Brewer challenged Pfauser's appraisal, commenting that his performance had improved. Brewer also has claimed that Pfauser was "nitpicking," and that the problems were the result of petty misunderstandings, or were not really problems at all. Nonetheless, in the days that followed the February 18, 1992 memorandum, Pfauser sought and obtained approval to terminate Brewer's employment. Brewer was discharged on March 9, 1992, and

4

this lawsuit ensued.  The district court granted summary judgment against Brewer.

                                II.

        We have jurisdiction pursuant to 28 U.S.C. § 1291 to review the final order of the district court, which exercised jurisdiction under 29 U.S.C. § 626(c)(1), 28 U.S.C. §§ 1331 and 1343(a)(4), and supplemental jurisdiction pursuant to 28 U.S.C. §1367.

        On review of a district court's grant of summary judgment, we apply the same test the district court should have applied initially.  Sempier v. Johnson & Higgins, 45 F.3d 724, 727 (3d Cir.), cert. denied, 115 S. Ct. 2611 (1995).  Summary judgment is appropriate only when the admissible evidence fails to demonstrate a genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  When the nonmoving party bears the burden of persuasion at trial, the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion at trial.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552-53 (1986).  Thereafter, the nonmoving party creates a genuine issue of material fact if it provides sufficient evidence to allow a reasonable jury to find for him at trial.  Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).  In reviewing the record, the court must give the nonmoving party the benefit of all reasonable inferences.

                                5

<u>Sempier</u>, 45 F.3d at 727; <u>Colgan v. Fisher Scientific Co.</u>, 935 F.2d 1407, 1413 (3d Cir.), <u>cert. denied</u>, 502 U.S. 941 (1991).

III.

The ADEA prohibits age discrimination in employment against any person over age forty.  29 U.S.C. § 623(a)(1). Because the prohibition against age discrimination contained in the ADEA is similar in text, tone, and purpose to that contained in Title VII, courts routinely look to law developed under Title VII to guide an inquiry under ADEA.  <u>See, e.g.</u>, <u>Maxfield v. Sinclair Int'l</u>, 766 F.2d 788, 791 (3d Cir. 1985), <u>cert. denied</u>, 474 U.S. 1057 (1986).  We follow the evidentiary framework first set forth by the Supreme Court in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817 (1973), subsequently refined in <u>Texas Department of Community Affairs v. Burdine</u>, 450 U.S. 248, 101 S. Ct. 1089 (1981), and recently clarified in <u>St. Mary's Honor Center v. Hicks</u>, __ U.S. __, 113 S. Ct. 2742 (1993).

In order to establish a <u>prima facie</u> case, Brewer must show that he: (1) is over 40; (2) is qualified for the position in question; (3) suffered an adverse employment decision; and (4) was replaced by a sufficiently younger person to permit an inference of age discrimination.  <u>Sempier v. Johnson & Higgins</u>, 45 F.3d 724, 727 (3d Cir.), <u>cert. denied</u>, 115 S. Ct. 2611 (1995). This showing creates a presumption of age discrimination that the employer can rebut by stating a legitimate nondiscriminatory reason for the adverse employment decision.  <u>Hicks</u>, __ U.S. at __, 113 S. Ct. at 2747; <u>Sempier</u>, 45 F.3d at 728.  The plaintiff

6

then has the opportunity to demonstrate that the employer's stated reason was not its true reason, but merely a pretext for discrimination. Hicks, __ U.S. __, 113 S.Ct. at 2747; Sempier, 45 F.3d at 728.

A.

The district court held that the disposition of this case turned on the third stage of the McDonnell Douglas analytical framework because Brewer had established a prima facie case of age discrimination, and Quaker State had articulated non-discriminatory reasons for Brewer's discharge. Brewer v. Quaker State Oil Ref. Corp., 874 F. Supp. 672, 681-82 (W.D. Pa. 1995). We agree with the district court's analysis up to this point. It is undisputed that Brewer is a member of a protected class, was discharged by Quaker State, and was replaced by an individual not within the protected class. Moreover, Brewer was qualified for the position of sales representative. He worked as a Quaker State sales representative for twenty-three years. During his last five years on the job, he received overall evaluations that translated into "competent" by Quaker State's performance standards. Accordingly, Brewer has established a prima facie case of age discrimination.

Quaker State has also established legitimate, non-discriminatory reasons for terminating Brewer's employment. Pfauser documented continuous performance problems, including poor follow-up on customer requests, poor communications with

7

clients and with management, too little time spent in his territory, and late and ambiguous sales reports.

B.

We must next determine whether Brewer has met his burden of demonstrating that a factfinder could find that the allegedly legitimate reasons proffered for his discharge were only a pretext for discrimination in order to survive Quaker State's motion for summary judgment. To defeat a summary judgment motion based on a defendant's proffer of nondiscriminatory reasons, a plaintiff who has made a prima facie showing of discrimination need point to some evidence, direct or circumstantial, from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reason; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. Fuentes v. Perskie, 32 F.3d 759, 763-64 (3d Cir. 1994). The factfinder may infer from the combination of the plaintiff's prima facie case, as well as its own rejection of the employer's proffered nondiscriminatory reason, that the employer unlawfully discriminated against the plaintiff and was merely trying to conceal its illegal act with the articulated reason. See Hicks, __ U.S. at __, 113 S. Ct. at 2749. Thus, if the plaintiff has pointed to evidence sufficient to discredit the defendant's proffered reason, to survive summary judgment the plaintiff need not also come forward with additional evidence of

8

discrimination beyond his or her prima facie case.  Fuentes, 32 F.3d at 764.

To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is "wise, shrewd, prudent, or competent."  Fuentes, 32 F.2d at 765 (citing Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 533 (3d Cir.), cert. denied, __ U.S. __, 114 S. Ct. 88 (1993)).  Rather, the nonmoving plaintiff must demonstrate such "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reason for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons."  Fuentes, 32 F.3d at 765 (citations and internal quotations omitted.).  See Ezold, 983 F.2d at 527 ("plaintiff has the burden of casting doubt on an employer's articulated reasons for an employment decision")(quoting Billet v. Cigna Corp., 940 F.2d 812, 828 (3d Cir. 1991).

Brewer has challenged Quaker State's asserted reasons for his discharge.  First, Brewer's own testimony disputed the significance of the problems raised by Pfauser.  While Brewer challenged the extent and degree of his deficiencies rather than their existence, Brewer testified to specific examples of Pfauser's errant or misplaced criticisms.  Such evidence amounts to more than his subjective opinion of his performance.  Second,

9

Brewer provided evidence that he had succeeded in selling oil for nearly twenty-five years in the employ of Quaker State, and for the last five years, he was rated "fully acceptable" by Quaker State in his evaluations. Third, Brewer provided evidence that he received a bonus for surpassing his sales quota in 1990 and 1991, and was the only salesperson in the Detroit region to exceed his or her sales quota for those years.

The district court discounted this evidence, reasoning that Brewer cannot pick and choose which employment standard he will meet. The district court reasoned that "although plaintiff's average numerical rating and sales bonus may be somewhat contradictory with the fact of his termination, the court does not believe that they give rise to such 'weaknesses, implausibilities, inconsistencies, incoherences, or contradictions' in Quaker State's explanation that a reasonable factfinder could rationally find the explanation unworthy of credence." Brewer, 874 F. Supp. at 682. We disagree that the "somewhat contradictory" evidence does not demonstrate a triable issue of fact. On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative. Sempier, 45 F.3d at 731. The fact that Brewer received a bonus three months before he was fired and was the only sales representative in the Detroit region who received such a bonus is contradictory to Quaker State's admission that the most important standard of job performance is sales.

Quaker State's Executive Vice President of Sales, William Marshall, stated that sales volume is "extremely

10

important in evaluating a salesperson," and represents "the best simple measure" of a salesperson's performance. App. at 200, 203. Quaker State's counsel also acknowledged this fact at oral argument before this court. Indeed, the volume of sales may always be the primary measure of a salesperson's performance. See Kiliszewski v. Overnite Transp. Co., 818 F. Supp. 128, 132 (W.D. Pa. 1993) (evidence that a person performed well in the traditional role of salesperson precluded summary judgment despite employer's claim that the plaintiff suffered from efficient time-management deficiencies). To segregate job performance into the neat categories of sales and organizational skills defies the reality of the role of a salesperson in a company.

We recognized that an employer may have any reason or no reason for discharging an employee so long as it is not a discriminatory reason.

> [W]e do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior.

McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir. 1992) (citations and internal quotations omitted). An employer may have a legitimate reason for firing an employee that has nothing to do with that employee's performance of the core functions of his or her job. Nonetheless, our role is to determine whether a factfinder could reasonably find that the

11

employer's stated reason is unworthy of credence. In this case, Brewer's deficiencies pale beside his consistently good sales performance, inexplicably unaccounted for in his supervisor's negative evaluations. A factfinder could find it implausible that Quaker State would have fired Brewer for such deficiencies when he was successful in the sole area identified by Quaker State's own performance incentive program -- sales.

In Ezold, 983 F.2d at 509, we held that a district court had erred in finding that the employer's explanation for denying a promotion to the plaintiff was pretextual. The employer claimed that it had denied partnership to the plaintiff because of her deficiencies in the area of legal analysis. There was no question that the plaintiff suffered from serious shortfalls in that area, although she had demonstrated success in other areas of the job. It was also clear that the employer considered legal analysis to be the critical category of performance review. The district court had questioned the wisdom of the employer's partnership standards, and we held that "[i]t was not for the district court to determine that Ezold's skills in areas other than legal analysis made her sufficiently qualified for admission to the partnership." Id. at 528. This case is distinguishable on its facts. In Ezold, the plaintiff suffered deficiencies in the one area deemed critical by the employer. Here, in contrast, Brewer had some problems in a few aspects of the job. Yet, he performed well in the one area deemed by Quaker State to merit a performance bonus. This raises

genuine issues about the credence of Quaker State's performance-based explanation.

It is also questionable why a company would fire the only salesperson to receive consecutive annual bonuses in response to the same organizational deficiencies that the employer had tacitly accepted for over two decades. During the twenty-three years that Brewer worked for Quaker State, he consistently sold a high volume of oil despite the repeated criticisms of other aspects of his job performance. It was not until late in his career that Quaker State turned the criticisms of Brewer's performance into the basis for adverse action. A reasonable factfinder could view Quaker State's belated reliance on these criticisms as evidence that tends to show pretext. See Levin v. Analysis & Technology, Inc., 960 F.2d 314, 317 (2d Cir. 1992) (employer's claim that plaintiff was terminated because of his "poor attitude" did not provide a basis for summary judgment where there was evidence that plaintiffs' "irascible nature had for many years been accepted by his co-workers and superiors"); Giacoletto v. Amax Zinc Co., 954 F.2d 424, 426-27 (7th Cir. 1992) (evidence supported a finding of pretext despite employer's claim that the plaintiff had "poor interpersonal skills as a manager" where the plaintiff "had been kept on as a supervisor for 14 years despite his abrasive personality and because of his ability to produce"); Blalock v. Metals Trades, Inc., 775 F.2d 703, 709 (6th Cir. 1985) (fact that the employer had legitimate concerns with the plaintiff's performance at the time of his discharge was not determinative where that "same level of performance" had been

acceptable to the employer until its consideration of a protected criterion).  Brewer's testimony disputing the significance of the alleged problems, his twenty-three years of consistently good sales performance and recent merit bonuses cast sufficient doubt on Quaker State's contention that Brewer was discharged because of poor job performance in areas which the company had long overlooked or tolerated.[0]

Brewer has also provided evidence that in August of 1991, Wanda Weaver, Quaker State's personnel manager, wrote a memorandum to Pfauser summarizing Brewer's performance for the last fifteen years.  In the memorandum Weaver noted that "Judd is 53 years old, which presents another problem."  App. at 24.  The district court determined that this statement merely indicated Weaver's awareness that, if terminated, Brewer may file an age discrimination suit.  Although the jury may very well conclude that this remark merely reflects an awareness of Quaker State's legal obligations, the statement is also subject to competing interpretations.  Another reasonable interpretation is that Brewer's age was a "problem" for Quaker State.  On summary

---

[0]The dissent states that Brewer has "done nothing to rebut" Quaker State's proffered non-sales reasons for firing him. Dissent Typescript at 5.  The dissent has overlooked evidence of Brewer's testimony in which he related specific examples of his supervisor's errant or misplaced criticisms.  Such evidence amounts to more than his subjective opinion of his job performance.  Of course, unrefuted evidence was also presented that Brewer's past performance for twenty years was identical to that for which he was fired.  It was not until late in his career that the criticisms of Brewer's performance were turned into reasons for his termination.  This evidence goes directly to discrediting Quaker State's non-sales related reasons for firing Brewer.

14

judgment, we must draw all reasonable inferences in favor of the nonmoving party. Drawing the inference in Brewer's favor, Weaver's statement tends to show a discriminatory animus. In viewing the record as a whole, as we must, we conclude that the statement is probative, and should be submitted for a jury's consideration.

Brewer next produced evidence that in March 1990, Jack Corn, Chief Executive Officer of Quaker State, discussed two new executives in the company newsletter. He stated, "two of our star young men in their mid-40s. That age group is our future." App. at 26-27. Brewer asserts that this remark is circumstantial evidence of Quaker State's preference for younger workers. The district court determined that Corn's statement was a "stray remark, unconnected with and remote from the decision-making process which resulted in Brewer's discharge." Brewer, 874 F. Supp. at 683.

We have held that stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision. Ezold, 983 F.2d at 545. We agree with the district court that the Corn statement is a "stray remark" made by a non-decisionmaker and temporally remote from the decision to terminate Brewer. The comment was made almost two years before Brewer's March 1992 termination. Brewer's supervisor testified that he could not recall ever seeing or hearing Corn's statement, and there is no evidence of a causal link between Corn's statement and Brewer's termination.

15

Though the Corn statement should not be given significant or commanding weight, at trial, it may provide some relevant evidence of discrimination. We have held that a supervisor's statement about the employer's employment practices or managerial policy is relevant to show the corporate culture in which a company makes its employment decision, and may be used to build a circumstantial case of discrimination. See Abrams v. Lightolier, Inc., 50 F.3d 1204, 1214 (3d Cir. 1995) (discriminatory statements by nondecisionmakers properly used to build a circumstantial case of discrimination); Lockhart v. Westinghouse Credit Corp., 879 F.2d 43, 54 (3d Cir. 1989) (same); see also Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 641 (3d Cir. 1993) (court may consider as circumstantial evidence the atmosphere in which the company made its employment decisions).

Corn's statement may be used as evidence of managerial policy. The remark was not an off-hand comment made by a low-level supervisor. Rather, the comment was made by the Chief Executive Officer in a written newsletter. "When a major company executive speaks, 'everybody listens' in the corporate hierarchy, and when the executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman." Lockhart, 879 F.2d at 54.

Quaker State claims that Corn's statement should not be considered evidence at all because it is too innocuous. The statement that the mid-40's age group is the company's future may

indeed be considered a truism -- the future of any business lies with its relatively young employees.  See, e.g., Smith v. Flax, 618 F.2d 1062, 1066 (4th Cir. 1980) (statement that "future lay in the employer's young Ph.D's" was a truism, and not evidence of age discrimination.).  Quaker State further asserts that praising the youth does not indicate bias against more mature workers.  See, e.g., Mesnick v. General Elec. Co., 950 F.2d 816, 826 (1st Cir. 1991). cert. denied, 504 U.S. 985 (1992).  While a factfinder could find Corn's comment too abstract to evince age discrimination, it may also be considered by the jury as evidence of the corporate culture in which the employment decision to discharge Brewer was made, and circumstantial evidence of age discrimination.  We conclude that the Corn statement is relevant evidence of age discrimination.


IV.

Brewer next argues that the district court erred in refusing to draw an adverse inference from Quaker State's inability to produce Brewer's pre-1990 personnel file.  The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established.  When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party that has prevented production did so out of the well-founded fear that the contents would harm him.  Gumbs v. International Harvester, Inc.,

17

718 F.2d 88, 96 (3d Cir. 1983); United States v. Charkasky Meat Co., 259 F.2d 89 (3d Cir. 1958).

For the rule to apply, it is essential that the evidence in question be within the party's control. Gumbs, 718 F.2d at 96. Further, it must appear that there has been an actual suppression or withholding of the evidence. No unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed, or where the failure to produce it is otherwise properly accounted for. See generally 31A C.J.S. Evidence §156(2); 29 Am. Jur. 2d Evidence § 177 ("Such a presumption or inference arises, however, only when the spoilation or destruction [of evidence] was intentional, and indicates fraud and a desire to suppress the truth, and it does not arise where the destruction was a matter of routine with no fraudulent intent.").

The district court found that the file was lost in connection with the death of Quaker State's in-house attorney, and was not destroyed intentionally. Quaker State's in-house attorney died of a terminal illness after he took possession of the file. Quaker State avers that it has continued to search for the file, but to no avail. We cannot say the district court applied the incorrect legal standard, nor were its factual findings clearly erroneous. The destruction or failure to produce the record could have been due to many reasons unrelated to the lawsuit. See, e.g., Rogers v. Exxon Research & Eng'g Co., 550 F.2d 834, 843 (3d Cir. 1977) (refusing to draw an adverse

18

inference where destruction of a diary could have been unrelated to the lawsuit), cert. denied, 434 U.S. 1022 (1978). The district court properly refused to draw an adverse inference.

V.

Brewer has also brought an age discrimination claim under the Michigan Civil Rights Act, Mich. Comp. Laws § 37.2101–2804. The district court held that Brewer failed to establish a prima facie case on his state law claim because he provided no evidence that Pfauser, or any other decisionmaker at Quaker State, was predisposed to discriminate against Brewer on the basis of age. Brewer, 874 F. Supp. at 687.

The evidentiary burdens for proceeding on an age discrimination claim under the Elliott–Larsen Civil Rights Act are the same as those used in ADEA cases. McDonald v. Union Camp Corp., 898 F.2d 1155, 1159 (6th Cir. 1990). However, in contrast to federal law, under Michigan law a plaintiff may establish a prima facie case by demonstrating that: (1) he is a member of the affected class; (2) that some adverse employment action was taken against him; (3) that the person responsible for this adverse action was predisposed to discriminate against persons in the affected class; and (4) that the person responsible actually acted on this predisposition to plaintiff's detriment. Pitts v. Michael Miller Car Rental, 942 F.2d 1067, 1070 n.1 (6th Cir. 1991).

A plaintiff may also establish a prima facie case under Michigan law using the traditional federal law standard set forth

19

in McDonnell Douglas, 411 U.S. at 802, 93 S. Ct. at 1824.[0]   The

McDonnell Douglas standard has been adopted by the Michigan

Supreme Court.  McDonald v. Union Camp Corp., 898 F.2d 1155,

1159-60 (6th Cir. 1990); Matras v. Amoco Oil Co., 385 N.W.2d 586,

590 (Mich. 1986).  Therefore, Michigan law provides that

establishing a prima facie case of age discrimination varies with

differing factual situations, and the standard that best fits the

factual allegations should be applied.  Matras, 385 N.W.2d at

590; Lytle v. Malady, 530 N.W.2d 135, 140 (Mich. Ct. App. 1995).

        The district court erred in applying only the prima

facie standard set forth in Pitts, 942 F.2d at 1070, and not the

McDonnell Douglas standard, which more closely fits the facts of

this case.  Accordingly, the district court's entry of summary

judgment on the state law claim will be reversed for the same

reasons that we will reverse the summary judgment entered on the

ADEA claim.

---

[0]A prima facie case as applied in the age discrimination context
requires a showing that the plaintiff: (1) was a member of a
protected class; (2) was subjected to adverse employment action;
(3) was qualified for the position; and (4) was replaced by a
younger person.

ROTH, Circuit Judge, Dissenting:  I respectfully dissent.  I cannot agree that Brewer's evidence of his sales performance rebuts Quaker State's litany of specific reasons for termination sufficiently to raise a genuine issue of material fact.  I would affirm the district court.[0]

Unlike the majority, I believe that the district court analyzed the case properly and reached a correct result.  In particular, I disagree with the majority's rebuke that the district court weighed disputed evidence.  See Majority at [typescript at 10].  I conclude that the district court, in granting summary judgment, properly focussed on Quaker State's articulated reasons for termination and determined that these reasons were an adequate, non-discriminatory basis for discharge even when considered along with Brewer's acknowledged sales record.

Our summary judgment inquiry comes flows from the Supreme Court's decision in Celotex Corp. v. Catrett, 477 U.S.

---

[0]     I have little quarrel with Parts I, II, III.A, or IV of the majority's opinion.  I disagree with Part III.B, and I would not reach Part V.  Because I would affirm the district court's grant of summary judgment for Quaker State on the federal claim, I would remand the state claims to the district court to determine whether jurisdiction should be retained pursuant to 28 U.S.C. § 1367(c)(3).

317 (1986), which applies equally to McDonnell Douglas discrimination cases. See Healy v. New York Life Ins. Co., 860 F.2d 1209, 1219 n.3 (3d Cir. 1988), cert. denied, 490 U.S. 1098 (1989). Under Celotex, the district court must evaluate the nonmovant plaintiff's evidentiary showing to determine whether the showing raises a genuine issue of material fact. This court's past discussions of the degree of proof required to survive summary judgment in McDonnell Douglas cases have recognized the need for this type of evidentiary evaluation. Fuentes v. Perskie provides our most extensive treatment of the subject. 32 F.3d 759 (3d Cir. 1994). "[T]o avoid summary judgment, the plaintiff's evidence . . . must allow a factfinder reasonably to infer that each of the employer's proffered nondiscriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext)." Id. at 764 (citations omitted) (first emphasis added); see Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir.) (adopting implicitly the "reasonable inference" standard), cert. denied, ___ U.S. ___, 115 S. Ct. 2611 (1995); accord Siegel v. Alpha Wire Corp., 894 F.2d 50, 53 (3d Cir.), cert. denied, 496 U.S. 906 (1990); Sorba v. Pennsylvania Drilling Co., 821 F.2d 200, 205 (3d Cir. 1987), cert. denied, 484 U.S. 1019 (1988).

In Fuentes, we observed that "this standard places a difficult burden on the plaintiff." 32 F.3d at 765. It requires the plaintiff to "present sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, the .

22

. . proffered reasons[.]" Id. (emphasis added). Elsewhere, we have described the standard in similar terms. See Seman v. Coplay Cement Co., 26 F.3d 428, 431 (3d Cir. 1994) ("our standard requires consideration of whether or not there is substantial evidence in the record to support an employee's contention that 'but for' his age he would not have been discharged" (citing Billet v. CIGNA Corp., 940 F.2d 812, 815 (3d Cir. 1991)).

In the present case, Brewer did not cast doubt on Quaker State's proffered reasons, i.e., he did not allege that they were not true. He contended instead that they were inadequate for discharge because he was a good salesman.

I cannot agree that Brewer's evidence meets the McDonald Douglas summary judgment standard. His general performance evidence, considered in connection with Quaker State's specific reasons for discharge, is insufficient to raise a genuine issue of material fact; the inferences he draws from his remaining evidence are unreasonable.

The majority opinion provides a fair summation of the facts of this case. Brewer was fired following a series of significant performance problems, such as letting his customers run out of oil and failing to complete or even file his paperwork. To demonstrate that these reasons were pretextual and that the real reason for his firing was age discrimination, Brewer offered three principal pieces of evidence: first, general performance evidence such as positive comments on personnel evaluations and a sales bonus for selling oil in the two years prior to termination; second, a personnel memorandum

3

written by Wanda Weaver, Quaker State's Manager of Employment and Compensation, and sent to Pfauser, Brewer's supervisor at the time, which summarized Brewer's personnel evaluations since 1975, approved a "performance plan" that Pfauser had submitted, and observed, "[a]lso, Judd is 53 years old, which presents another problem"; and third, a comment by Jack Corn, then chief executive officer of the company, in the company newspaper referring to two of his new "seconds-in command" as "two of our star young men in their mid-40s . . . [t]hat age group is our future . . .."

For clarity, I will analyze each of Brewer's evidentiary proffers independently. Brewer's general evidence of acceptable job performance forms the nub of the case. The Weaver memorandum and the Corn comment are far weaker and, I believe, insufficient to stave off summary judgment absent Brewer's evaluations and sales bonus.

Quaker State alleges that it fired Brewer for a litany of specific performance problems. Brewer responds with generic evidence of his generally successful performance as a salesman. The majority believes that Brewer's showing reveals sufficient "weaknesses, implausibilities, inconsistencies, incoherences, or contradictions" in Quaker State's explanation to produce a triable issue of fact. Majority at ___ [typescript at 10]. I do not agree.

Brewer's general evidence of good performance is insufficient to cast doubt on the specific and undisputed reasons for termination articulated by Quaker State. Put simply, good salesmen get fired for non-sales related reasons. Quaker State

4

proffered such reasons, and Brewer has done nothing to rebut them. Good performance alone will not raise an inference of wrongful termination. See Turner v. Schering–Plough Corp., 901 F.2d 335, 343-44 (3d Cir. 1990) (observing that close proximity between positive evaluations and terminations will not necessarily raise an inference of pretext); Healy, 860 F.2d at 1215 (noting that awards, commendations, and promotions do not suggest that countervailing weaknesses do not exist or would not be important in future evaluations). Brewer's failure to carry out specific tasks is dispositive, regardless of his general proficiency. Pierce v. New Process Company, 580 F. Supp. 1543, 1546 (W.D. Pa.), aff'd 749 F.2d 27 (3d Cir. 1984) ("The absence of complaints about performance, the absence of earlier commands, and plaintiff's own opinion . . . are all irrelevant in light of the direct order . . . which plaintiff undeniably failed to carry out.").

Because Brewer failed to offer evidence that addresses Quaker State's reasons, summary judgment was properly granted. See Geary v. Visitation of the Blessed Virgin Mary Parish School, 7 F.3d 324, 332 (3d Cir. 1993) (affirming summary judgment where employee did not contest reason for dismissal); Turner, 901 F.2d at 344 (affirming summary judgment where "[the employee] has offered no evidence tending to show that serious and unattended problems did not exist within his jurisdiction or that [the employer's] other criticisms at the time of the . . . decision were unjustified."); Keller v. Bleumle, 571 F. Supp. 364, 369 (E.D. Pa. 1983), aff'd, 735 F.2d 1349 (3d Cir. 1984) (noting that

5

employee explained deficiencies but did not contest them); see also Fowle v. C & C Cola, 868 F.2d 59 (3d Cir. 1989) (affirming summary judgment where employee failed to rebut employer's reason of lack of qualifications); Spangle v. Valley Forge Sewer Authority, 839 F.2d 171 (3d Cir. 1988) (affirming grant of summary judgment where employee presented no evidence to show he was qualified for the job).

Brewer's position in this case differs from previous cases where employees have used general performance evidence to rebut a proffered reason for discharge. Although we have repeatedly recognized that employees can rely on evidence of good performance to show pretext, in those cases the employers have inevitably relied on poor performance as a reason for termination. See, e.g., Waldron v. SL Indus. Inc., 56 F.3d 491, 496 (3d Cir. 1995) (rebutting poor performance charge and charge of economic necessity); Sempier, 45 F.3d at 730 (rebutting with performance evidence where non-performance was sole reason given); Colgan v. Fisher Scientific Co., 935 F.2d 1407, 1422 (3d Cir.) (in banc), cert. denied, 502 U.S. 941 (1991) (allowing employee to contest poor evaluation using testimony of co-workers); Siegel v. Alpha Wire, 894 F.2d at 51-52 (rebutting charge of poor performance and disloyalty); Sorba, 821 F.2d at 205 (rebutting charge of poor performance); Chipollini, 814 F.2d at 900 (rebutting charge of poor performance based primarily on credibility of employee). Had Quaker State relied on poor sales performance as its reason for discharge, I would confidently join the majority in finding that reason rebutted and hence a

6

reasonable inference of pretext.  That is not the case:  Quaker State terminated Brewer because of specific failures and omissions, not because of generally inadequate performance.

Nevertheless, at some level of analysis, performance evidence will always be relevant.  Even though Quaker State did not rely on poor performance per se, we must still consider it.  As we explained in a footnote in Fuentes, "a decision foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation can render it implausible, inconsistent, or weak."  32 F.3d at 765 n.8.  Because firing an extremely qualified and effective employee could be "foolish, imprudent, or incompetent by comparison to the employer's usual mode of operation," the court on summary judgment must inevitably consider employee performance.

Brewer's performance evidence comes to naught.  Under our rule in Fuentes, unless the employer relies on poor performance as an articulated justification, the evidence of good performance must be sufficient to make the employer's decision appear "foolish, imprudent, or incompetent."  Neither Brewer's sales bonus nor his inconsistent, often mediocre, but occasionally complementary evaluations meet this burden.  See Turner, 901 F.2d at 343 (refusing to find issue of fact from employee's mixed reviews); Healy, 860 F.2d at 1215 (affirming grant of summary judgment despite generally positive and at worst mixed performance evaluations); see also Fowle, 868 F.2d at 67 (discounting positive performance evaluations).  A company is not "foolish, imprudent, or incompetent" when it fires a salesman who

7

lets his customers run out of oil, fails to spend sufficient time in his territory, and consistently neglects his paperwork.

Moreover, in firing Brewer, Quaker State did not deviate from "the employer's usual mode of operation." Fuentes, 32 F.3d 765 n.8. The majority suggests otherwise, claiming that "[i]t is also questionable why a company would fire [a] salesperson . . . in response to the same organizational deficiencies that the employer had tacitly accepted for over two decades." Majority at ___ [typescript at 13]. This court has recognized that changes in circumstances can turn flaws that were previously overlooked into legitimate reasons for termination. See Healy, 860 F.2d at 1215, 1220 (discussing change in employee environment). It was undisputed that Brewer's problems came to a head after his transfer to Detroit, where he encountered a supervisor who was hard on everyone and a stickler for rules. App. at 72a ("[Pfauser] is a cross the Ts and dot the Is type of person to the point of being almost a fanatic about it. Corporate policy was always first in line, . . . [a]nd it affected everybody out there.") (deposition of Judd Brewer). Contemporaneous with Brewer's termination, Brewer's supervisor fired a thirty-two year old salesman for almost identical deficiencies. See Brewer, 874 F. Supp. at 686; cf. Waldron, 53 F.3d at 499 (relying on evidence of double standard to reverse summary judgment). Brewer experienced a change in circumstances after which his previous deficiencies were no longer accepted. There is no contradiction here.

8

In an effort to create a contradiction, the majority makes much of Brewer's sales bonuses combined with a Quaker State executive's statement that sales volume is "extremely important in evaluating a salesperson." Majority at ___ [typescript at 11]. Unfortunately, the two propositions in the majority's constructed contradiction pass in the night. Proposition A, that Brewer was fired despite good sales figures, simply does not contradict Proposition B, that sales volume is "extremely important in evaluating a salesperson." Descriptives such as "extremely important" and "best simple measure" show that sales volume is one important factor to the company, indeed one very important factor to the company, but they do not show that sales volume is the only important factor to the company. Absent this final alternative, Brewer could have had more than acceptable sales numbers and still be fired for cause without contradiction.

The majority next suggests that "[t]o segregate job performance into the neat categories of sales and organizational skills defies the reality of the role of a salesperson in a company." Majority at ___ [typescript at 11]. In addition, it finds in Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992), cert. denied, ___ U.S. ___, 114 S. Ct. 88 (1993), the concept of a job's "critical area," implying that a company which fires an employee despite acceptable performance in that critical area automatically raises an inference of pretext.[0] These arguments dress the same contention in different

_____

[0]        I note in passing that to the extent Ezold stands for the proposition that an employee who falls short in a critical

clothes.  To paraphrase the argument, the majority claims that selling is what salesmen do, so firing a salesman who sells is inherently pretextual.

I cannot agree.  The "reality of [a salesperson's] role," and the "critical area" of a job are simply not helpful concepts.[0]  See Perry v. Prudential-Bache Sec., Inc., 738 F. Supp. 843 (D.N.J. 1989), aff'd, 904 F.2d 696 (3d Cir.), cert denied, 498 U.S. 958 (1990) (affirming summary judgment for employer despite showing that terminated employee excelled in core skill of underwriting).  Both concepts attempt to establish a general ideal of "performing the job" such that any contrary reason given by the employer conflicts with that ideal.  In doing so, the majority adopts the very posture of "super-personnel

---

area of performance can be terminated despite demonstrated success in other job areas, it does not follow that an employee cannot be terminated for failures in other job areas despite success in a critical area.

[0]        A brief hypothetical reveals the difficulties with these ideas.  An associate in a law firm excels at legal research, the "critical area" of his job.  Yet on several occasions, this associate fails to send documents to an important client.  He also consistently neglects to record his billable hours and maintain other mundane aspects of law office paperwork.  Although some partners accept these foibles, the associate eventually encounters a more particular supervising attorney who seeks and obtains his termination.  Assuming that the associate's subsequent suit for discriminatory discharge reached the pretext stage, I have little doubt that this hypothetical associate could not rebut the employer's specific reason for termination with general evidence of good performance in the critical area of his job.  Nor could some elusive vision of the "reality of a lawyer's role" aid him in linking inextricably his failings in correspondence and paperwork to his more successful forays in the firm library.  Such evidence of good performance would not raise an inference that the employer's reasons for termination were pretextual.  Indeed, such evidence would be entirely consistent with the reasons given for termination.

10

department" that it all too strenuously declines. Majority at [typescript at 11]. The majority defines the essence of a sales position and evaluates Brewer's performance against that standard. I would save this court the task of redefining Brewer's job description to include only those requirements that he could meet. We should instead look to whether his good sales performance was inconsistent with his reasons for termination. I find no contradiction and no reasonable inference of pretext.

It also bears noting that in firing Brewer, Quaker State committed none of the questionable acts which we have cited in the past as indicative of pretext. Brewer's performance problems were long-standing and well documented. See Healy, 860 F.2d at 1215 (discounting performance based inferences where complaints were long-standing and the employee had been informed of their nature); Billet, 940 F.2d at 827 (same); cf. Colgan, 925 F.2d at 1422 (stressing that evaluations were a surprise and that ratings became aberrationally low when employee refused to retire). He never contested these evaluations prior to termination.[0] There was no evidence of corporate machinations or a plot to transfer Brewer and set him up for termination. Cf. Waldron, 56 F.3d at 496-97; Armbruster, 32 F.3d at 772-74. Brewer offered no statistical or testimonial evidence indicating that

---

[0] This fact makes Brewer's claim of pretext sound like a post hoc explanation. Although the post hoc concept is typically applied to the employer's reason for terminating the employee, it is equally valid here. Just as post hoc timing indicates the employer's reason is pretext, see Waldron, 56 F.3d at 498; Sempier, 45 F.3d at 731; Fuentes 32 F.2d at 764; Siegel v. Alpha Wire, 894 F.2d at 55, it similarly undermines Brewer's claim.

11

Quaker State had discriminated against similarly situated parties. Cf. Siegel v. Alpha Wire, 894 F.2d at 55.

In my view, Brewer's performance evidence fails to reach the quantum required by Fuentes. He has not presented "sufficient evidence to meaningfully throw into question, i.e., to cast substantial doubt upon, [the defendant's] proffered reason . . . (e.g., by painting them as weak, implausible, contradictory, or incoherent)[.]" 32 F.3d at 765. Indeed, he has presented no evidence indicating that his employer did not act for its asserted non-discriminatory reasons. The record shows Quaker State's reliance on his failure to meet work requirements to be adequate, plausible, consistent, and coherent.[0]

Having addressed the sufficiency of Brewer's general performance evidence, I now turn to the two other items that he proffers, the Weaver memorandum and the Corn comment. For both items, the inference of discrimination that Brewer hopes to draw is unreasonable "in light of competing inferences." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 589 (1986).

---

[0]        As we have so often observed, McDonnell Douglas cases are inherently fact-specific. Billet, 940 F.2d at 828 ("discrimination cases are inherently fact-bound"); Healy, 860 F.2d at 1215 ("each ADEA case must be judged on its own facts"). My rejection of Brewer's showing would not foreclose the success of some future performance-based challenge to termination, either where the employer relied on poor performance as one of its justifications or where, as per Fuentes, the employee's performance is sufficient to make the employer's decision appear "foolish, imprudent, or incompetent." See Fuentes, 32 F.3d at 764 n.7 (explaining that employee need only cast doubt on certain employee reasons). Brewer's evidence, however, does not meet this burden, and the grant of summary judgment was proper.

12

As to the Weaver memorandum, I have little to add to the analysis of the trial court.  Brewer, 874 F. Supp. at 683–84.  Brewer greatly amplified the impact of Weaver's "[age] presents another problem" statement by repeatedly quoting it out of context.  When the letter is read as a whole, it becomes apparent that an inference of age discrimination is not reasonable.[0]  The

_____

[0]    To properly evaluate the statement, it must be understood as written.  This extensive quotation places the comment in context:

> The performance plan that you outlined . . . is excellent.  It is important that you identify specific deficiencies [in Brewer's performance] and the results desired by management.
>
> At this point in time, I would recommend that you identify specific monthly dates when you two can get together and discuss results over the previous thirty (30) days.  The results of those meetings should be summarized in letter format and Judd should <u>sign</u> the letter to acknowledge receipt.  It is also important that we provide Judd with written notice of action that will be taken if the problems are not corrected.  I suggest summarizing your meeting of August 19, acknowledge receipt by Judd, and close the letter by stating, "I must emphasize to you that your failure to permanently improve your work performance may lead to more severe discipline, up to and including discharge."
>
> Attached for your review is a brief summary of Judd's performance appraisals over the last 15 years.  I am disappointed that action was not taken years ago to correct these problems.  It is apparent from the performance appraisals that he has had ongoing performance problems throughout his employment history.
>
> I am obviously concerned that we have to take this type of action after 23 years of

13

district court drew the only reasonable conclusion: "The statement as to Brewer's age being a 'problem,' together with the notations of his age and years of service, obviously indicate Weaver's awareness that Brewer might file an age discrimination lawsuit if terminated." Id. at 684.

From the tone of the sentence and its placement in the memorandum, it is clear that Brewer's age militates against his firing. The comment appears in a separate paragraph from the discussion of Brewer's employment problems. Moreover, in Weaver's unrebutted deposition testimony, she stated that standard procedures were followed in requiring documentation of Brewer's performance while on probation and that she highlighted Brewer's age to alert his supervisor to his protected status and to ensure that age was not the reason for termination. Id.; see Perry v. Prudential–Bache Sec., Inc., 738 F. Supp. 843, 849 (D.N.J. 1989) (holding that age data on various employment records was used for computing employee's pension, not for the purpose of discrimination), aff'd, 904 F.2d 696 (3d Cir.), cert. denied, 498 U.S. 958 (1990). The district court correctly

_____

> employment. Also, Judd is 53 years old, which presents another problem. However, within the next ninety (90) days, it is extremely important for you to document as much as possible in the event his performance does not improve.
>
> Please forward each letter for our personnel file in Oil City. I will stay in touch with you to see what progress has been made . . ..

App. at 24.

14

concluded that nothing supported an inference of discrimination, a conclusion that is all the more valid in light of Brewer's long history of employment problems.

As to the Corn comment, it expresses a truism that I would deem to be a stray remark by a non-decisionmaker. Even if it were to be considered relevant, I do not believe that it would create a material issue of fact sufficient to warrant a denial of Quaker State's motion for summary judgment. See White v. Westinghouse Elec. Co., 862 F.2d 56, 61 (3d Cir. 1988) (considering similar comments); Perry v. Prudential-Bache Sec. Inc., 738 F. Supp. 843, 849 (D.N.J. 1989) (same), aff'd 904 F.2d 696 (3d Cir.), cert. denied, 498 U.S. 948 (1990). I will not dwell on it further.

I conclude that, viewed as a whole, the record contains nothing that casts meaningful doubt on Quaker State's proffered reason for Brewer's discharge. "While plaintiff is 'entitled to every favorable inference,' he is not entitled to build a case on 'the gossamer threads of whimsy, speculation and conjecture.'" Keller v. Bluemle, 571 F. Supp. 364, 371 (E.D. Pa. 1983), aff'd, 735 F.2d 1349 (3d Cir. 1984).

I do not believe that Brewer has made the showing necessary to survive a motion for summary judgment. Because I would affirm the district court, I respectfully dissent.

15