**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1427
_____

WILLIAM E. HOOKER,

Appellant

v.

NOVO NORDISK INC.
_____

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
(D.C. Civ. Action No. 3:16-cv-04562)
District Judge: Honorable Michael A. Shipp
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
December 14, 2020

BEFORE:  GREENAWAY, JR., SHWARTZ, and FUENTES, *Circuit Judges*

(Filed: July 22, 2021)
_____

Opinion*
_____


_____

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

GREENAWAY, JR., *Circuit Judge*.

Appellant William Hooker alleges that his employer, Novo Nordisk, Inc. ("NNI"), terminated his employment in violation of the Age Discrimination in Employment Act ("ADEA") and the New Jersey Law Against Discrimination ("NJLAD"). He also alleges unlawful retaliation pursuant to the same statutes. Hooker also brought a retaliation claim pursuant to 42 U.S.C. § 1981. The United States District Court for the District of New Jersey granted summary judgment for NNI on all claims. We will affirm.

## I.    BACKGROUND

In August 2006, Hooker began working at NNI, a subsidiary of Novo Nordisk, A/S, a Danish pharmaceutical company. Hooker served as a manager of strategic sourcing in NNI's Plainsboro, New Jersey office and was fifty-four years old when he was hired. In 2008, senior director Bernard Wright promoted Hooker to senior manager. In that role, Hooker's responsibilities entailed managing sourcing projects for the organization and creating a supplier diversity program. In his performance evaluations between 2006 and 2011, Hooker received ratings of "Meets" or "Exceeds" expectations. App. 0504.

In 2010, Karsten Knudsen, NNI's Vice President of Finance, came to the United States to work in NNI's Plainsboro office. Knudsen oversaw Wright, whom Knudsen terminated around 2012. In 2012, Knudsen temporarily became Hooker's direct supervisor. During that time, Hooker applied for an open position previously occupied by his former boss, Wright. The job went to a well-qualified external candidate, Richard Houtz, who became Hooker's supervisor and reported directly to Knudsen. Hooker

2

alleged that when Knudsen hired Houtz, Knudsen had stated that he wanted to bring some "fresh blood" into the organization. App. 0414. Hooker interpreted "fresh" to mean "younger." App. 0414. Knudsen believes he meant "inspiration from . . . outside" the company. App. 0533.[1]

In Hooker's 2012 mid-year review, Knudsen informed Hooker that his savings for the first half of 2012 were "below expectations." App. 0101. In February 2013, Houtz provided Hooker with his 2012 performance review and noted that Hooker's full-year contributions were also below expectations. Houtz rated Hooker's performance as "approach[ing] expectations and goals." App. 0217. Following the review, Houtz placed Hooker on an Action Plan, which outlined goals for Hooker to meet to increase his performance. Hooker communicated to Houtz that he felt "blindsided" by the performance review. App. 0219. Sometime after, Hooker met with NNI's Human Resources department and claimed that he believed Knudsen was discriminating against him because of his age. In that meeting, Hooker alleged that Knudsen had told him that the organization needed "fresh blood." App. 0222. Hooker also maintained that in 2012, Jesper Brandgaard, the CFO of Novo Nordisk, A/S, stated that the company was a "very young organization" but also that they "like the older people too." App. 0412. After Hooker's meeting with Human Resources, NNI hired third party counsel to interview

_____

[1] Hooker also alleged that Knudsen made a racially insensitive comment to him about another person on one occasion.

3

Hooker, Houtz,[2] and Knudsen. After third party counsel completed an internal investigation, it issued a report finding no evidence of discrimination against Hooker.

In July 2013, Houtz extended Hooker's Action Plan to September 2013. Houtz did not believe that Hooker had achieved the goals set out by his previous plan. Later that July, Michael Hicks replaced Houtz as Hooker's supervisor. Hicks removed Hooker from his Action Plan in October 2013 because he believed Hooker's "ability to partner with [his] key stakeholders and [his] ability to balance [his] priorities ha[d] improved." App. 0569. But over a year later, in February 2015, Hicks concluded that "it is apparent that [Hooker]'s level of skill is not commensurate with that of a Senior Category Manager."[3] App. 0259. Hicks noted that, as a result, he would "attempt to actively manage a better level of performance in 2015." App. 0259. At that time, Hooker also received warnings for several instances in which he did not show an understanding of "basic procurement concepts" and failed "to act independently in his role to produce expected results." App. 0262, 0263.

Hicks thus put Hooker on another Action Plan in February 2015 ("Second Action Plan"). In response, Hooker stated that he needed more coaching.[4] The Second Action

_____

[2] Hooker ascribes no discriminatory remarks to Houtz.

[3] Hooker states that Hicks never made discriminatory remarks to him.

[4] Notwithstanding Knudsen's removal from the direct line of Hooker's supervision for over three years (in July 2014, Knudsen was promoted to global senior vice president of corporate finance and moved back to Denmark), Hooker maintained that he was "wary" of the reviews based on Knudsen's previous alleged desire to "prune" older workers from the organization. App. 0267.

Plan required Hooker to complete two tasks: develop a medical communications final pricing proposal and engage in a promotional materials ordering project. After Hooker completed the projects, Hicks believed that Hooker had not enhanced or shown improvement in his analytical skills during the period of the Second Action Plan.

Hicks then placed Hooker on a Performance Improvement Plan ("PIP"), which the company institutes for employees who have already been placed on an Action Plan. In July 2015, Hooker requested to be removed from the PIP, as he felt his performance had improved. Later that month, Hicks recommended to Human Resources that Hooker be terminated based on "incomplete" and "inaccurate" work. App. 0345. In August 2015, Hicks and a Human Resources representative terminated Hooker. A fifty-three-year-old replaced Hooker, who was sixty-two when NNI terminated him.

Following his termination, Hooker sued NNI in the United States District Court for the District of New Jersey. Hooker alleged that NNI fired him because of his age. He brought claims for age discrimination under the ADEA and NJLAD and for unlawful retaliation under the ADEA, NJLAD, and 42 U.S.C. § 1981. NNI moved for summary judgment, which the District Court granted in its favor on all counts. The District Court found that Hooker's previous positive reviews from 2006 to 2011 could not establish pretext, since those reviews did not constitute proof that Hooker had recently performed well. The District Court also noted that comments made by NNI employees pertaining to "fresh blood," "pruning the workforce" and NNI being a "young company" failed to establish that Hooker's age was the "but-for" cause for his termination. *Hooker v. Novo Nordisk, Inc.*, No. 16-cv-04562, 2020 WL 526165, at *6 (D.N.J. Jan. 31, 2020). The

5

District Court determined that these comments, which Hooker relied on to establish pretext, were insufficient to raise a genuine dispute as to any material fact. The District Court then found that Hooker had failed to state a prima facie case on his retaliation claims because he could not show any causal connection between his complaints and the termination of his employment. This appeal followed.

## II.     JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1332. We have jurisdiction under 28 U.S.C. § 1291.

We review de novo a district court's disposition of a summary judgment motion. *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc). We therefore apply the same standard for summary judgment as the District Court. *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001). A court reviewing a summary judgment motion must evaluate the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d 326, 330 (3d Cir. 1995). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).

## III.     DISCUSSION

Hooker argues that the District Court erred in granting summary judgment on his claims for age discrimination and retaliation. Hooker also challenges the District Court's grant of summary judgment on both of his retaliation claims.

6

## A.    AGE DISCRIMINATION

We agree with the District Court's determination that Hooker's age discrimination claims fail.

Under the ADEA, it is unlawful for an employer "to fail or refuse to hire or to discharge any individual . . . because of such individual's age."  29 U.S.C. § 623(a)(1). Along similar lines, the NJLAD provides that "[a]ll persons shall have the opportunity to obtain employment . . . without discrimination because of . . . age."  N.J. Stat. Ann. § 10:5-4.  In assessing a claim of age discrimination under the ADEA, courts employ the *McDonnell Douglas* burden-shifting framework.  *Walton v. Mental Health Ass'n. of Se. Pa.*, 168 F.3d 661, 667-68 (3d Cir. 1999) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  New Jersey also uses the *McDonnell Douglas* burden-shifting scheme for discrimination cases.  *See Jakimas v. Hoffmann–La Roche, Inc.*, 485 F.3d 770, 788 (3d Cir. 2007) ("[T]he standards applied to ADEA cases are applied to age claims under the NJLAD unless there is divergent language between the statutes.").

A plaintiff alleging employment discrimination under the ADEA must make a prima facie case with four elements: (1) she is over 40 years old; (2) she is qualified for the position; (3) she suffered from an adverse employment decision; and (4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination.  *Potence v. Hazleton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004). Under the burden-shifting framework, once the plaintiff makes out a prima facie case, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse action.  *McDonnell Douglas*, 411 U.S. at 802.

7

If the employer establishes a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to show that the employer's stated reason was pretextual. *Willis v. UPMC Child.'s Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015); *see Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 800 (3d Cir. 2003) (Plaintiff must provide "evidence that would allow a fact finder reasonably to '(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not the motivating or determinative cause of the employer's action.'" (quoting *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 413 (3d Cir. 1999)).

Both parties agree that Hooker established a prima facie case of age discrimination and that NNI proffered a nondiscriminatory reason—poor performance—for Hooker's termination. Thus, it was Hooker's burden to show that NNI's reason was pretextual. Hooker maintains that the District Court overlooked evidence that is favorable to him. He principally argues that the District Court failed to consider NNI employees' comments and references about youth. Hooker suggests that his prior satisfactory performance, positive comments from supervisors, and the alleged "[u]nattainable" goal structure of his Action Plans combine to show that NNI's termination was pretextual. Appellant's Br. 20. These reasons do not overcome NNI's legitimate nondiscriminatory reason for terminating Hooker.

Hooker began receiving negative reviews in 2012, three years before Hicks terminated Hooker's employment. During his 2012 performance review (conducted in February 2013), Houtz—a different manager—informed Hooker that he needed to strengthen his sourcing activities. Houtz assessed that he was below expectations –

8

reflected in Hooker's next-to-lowest rating on NNI's performance rating scale. Following the review, Houtz placed Hooker on a three-month Action Plan, which outlined goals for Hooker to meet to increase his performance. The Action Plan required that Hooker "increase his ability to influence and persuade internal customers, demonstrate $2 million in savings by the end of the Action Plan, and dedicate 80% of his time to stakeholder management, category strategy development, strategic sourcing execution, and overall supplier management, with 20% devoted to the supplier diversity initiative." App. 0056. When Hooker failed to meet his savings goal of $2 million, Houtz extended Hooker's Action Plan to September.

When Hicks replaced Houtz as Hooker's direct supervisor in July 2013, he terminated Hooker's Action Plan and gave him a fresh start. But Hooker required performance coaching, significant feedback, and weekly meetings throughout 2014. Hicks independently determined that Hooker's performance needed improvement in several areas of category management. For instance, in Hooker's 2014 year-end review, Hicks wrote that Hooker "strugg[led] with several key components of Procurement, from the most basic (e.g., demand profiling) to the semi-complex (e.g., supplier pricing rationale and legitimacy)." App. 0252. Hicks then put Hooker on the Second Action Plan in February 2015 because of his lack of understanding of "basic procurement concepts." App. 0262. After time had elapsed under the Second Action Plan, Hicks concluded that "[Hooker] had not sufficiently improved in exercising his analytical skills and independently producing results in projects requiring those skills." App. 0063.

9

Hooker spent two more months on a PIP directly after the Second Action Plan ended, but his work did not improve.

Hooker fails to establish that his documented and longstanding poor performance was a pretext for his termination. He attributes no ageist prejudice or action to Hicks, the relevant decisionmaker. And Hooker has not established that Knudsen and Brandgaard— who allegedly did harbor ageist bias according to Hooker—had any influence on the decision to terminate him. Hooker failed to provide evidence that discrimination was more likely than not a motivating factor or determinative cause of termination. *See Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). Thus, the District Court properly granted summary judgment on his age discrimination claims.

## B.     RETALIATION

We also agree that the District Court properly granted summary judgment because Hooker presented insufficient evidence to support his retaliation claims to create a genuine dispute of material fact.

To establish a prima facie claim for retaliation, a plaintiff must show that: "(1) he was engaged in protected activities; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 508-09 (3d Cir. 2004).

If the plaintiff establishes a prima facie case of retaliation, under *McDonnell Douglas*, "the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its conduct." *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006)

10

(quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)) (internal quotation marks omitted). "The employer's burden at this stage is relatively light: it is satisfied if the defendant articulates any legitimate reason for the [adverse employment action]; the defendant need not prove that the articulated reason actually motivated the [action]." *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003) (quoting *Krouse*, 126 F.3d at 500) (alterations in original). If the employer does so, the burden shifts back to the employee, who "must produce sufficient evidence to allow a reasonable fact finder to conclude that the proffered reasons for not rehiring him are a pretext for illegal discrimination or retaliation." *Sarullo*, 352 F.3d at 799-800.

Hooker alleges that NNI terminated his employment in retaliation for complaints he made about age discrimination and for flagging several age-based comments and one alleged racially offensive comment made by Knudsen. But the District Court was correct that Hooker neglected to establish a causal connection between these complaints—which began after his first negative performance review in January 2012—and his termination years after the initial complaints.

"To establish the requisite causal connection a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). "An employee cannot easily establish a causal connection between his protected activity and the alleged retaliation when he has received significant negative

11

evaluations before engaging in the protected activity." *Ross v. Gilhuly*, 755 F.3d 185, 194 (3d Cir. 2014).

Hooker has failed to show that NNI had a retaliatory motive in terminating him. Indeed, there is no evidence connecting Hooker's termination to his complaints—years earlier—about Knudsen's comments. Knudsen directly supervised Hooker for only five months from January to June 2012. After Houtz was hired to NNI and became Hooker's supervisor, Knudsen was one level removed from the decisionmaking on Hooker.[5] When Hicks ultimately terminated Hooker, Knudsen was no longer in the United States or working for NNI.[6] Hooker was struggling with poor performance for almost the entire period of the Action Plans – nearly three years. *See* App. 0504 (listing Hooker's annual performances as "Approaches" or "Meets" expectations from 2012 onward). Hooker's negative feedback began before his first complaint to management, he was placed on Action Plans both before and after his complaints, and he presented no evidence of intervening antagonism or retaliatory animus after his initial Human Resources complaint. The District Court thus properly granted summary judgment for NNI on the retaliation claims.

## IV.    CONCLUSION

---

[5] We have explained that "[s]tray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision." *Fuentes*, 32 F.3d at 767 (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 545 (3d Cir.1992)).

[6] Hicks was not an NNI employee when Knudsen made the age-related comments that Hooker alleges.

For these reasons, we will affirm the order of the District Court.