**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 22-2568

_____

DOMETA MOYE,
Appellant

v.

VERLAND FOUNDATION

_____

On Appeal from the United States District Court
For the Western District of Pennsylvania
(District Court No. 2-21-cv-00646)
District Judge:  Honorable William S. Stickman IV

_____

Submitted Pursuant to Third Circuit L.A.R. 34.1(a)
July 13, 2023

_____

Before:  SHWARTZ, RESTREPO, and CHUNG, <u>Circuit Judges</u>

(Filed: August 16, 2023)

_____

OPINION[*]

_____

**CHUNG**, <u>Circuit Judge</u>.

Dometa Moye sued her former employer, Verland Foundation ("Verland"),

claiming: (1) race discrimination in violation of Title VII of the Civil Rights Act of 1964,

42 U.S.C. § 2000e <u>et seq.</u>; the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the

Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 <u>et seq.</u>; and (2)

workers' compensation retaliation in violation of Pennsylvania tort law. The District

Court granted Verland's motion for summary judgment. We will affirm the order of the

District Court because Moye did not establish a genuine dispute of material fact that the

non-discriminatory and non-retaliatory reasons for her firing were pretextual.

I.      <u>BACKGROUND</u>[1]

Dometa Moye, who is black, began working at Verland in 2012 as a registered

nurse. Verland is a non-profit organization that provides housing and services for

individuals with disabilities. Verland promoted Moye to Assistant Director of Nursing

("ADON") in 2015, and to Director of Nursing ("DON") in June 2018.

In 2018, Verland hired consultants, led by consultant Dr. Victoria Lund, to review

its practices and assist Verland in implementing a clinical "Quality Assurance (QA)

---

[*]     This disposition is not an opinion of the full Court and, pursuant to I.O.P. 5.7, does
not constitute binding precedent.

[1]     Because we write for the parties, we recite only facts pertinent to our decision.

2

Program." Appendix ("App.") 219. Dr. Lund's team met with and observed Moye in her role as DON and expressed concerns about Moye to Verland. In March 2019, Moye's direct supervisor, CEO William Harriger, voiced concerns to Moye and told her that she should "consider [her] job … at stake." Id. at 243–44.[2] In April 2019, Dr. Lund's team submitted a report discussing Verland's operations, including several criticisms related to Moye in her role as DON. In August 2019, Dr. Lund recommended that Moye be "let go" from her role as DON and not even be retained as a staff nurse. Id. at 105, 404.

Based on the consultants' report, Verland decided that the DON should report to someone with "clinical expertise" and created a new role titled the "Vice President of Clinical Services." Id. at 110–11. In September 2019, Verland hired Nicole Garcia to this new role. Garcia also observed performance "issues over time" as she supervised Moye. Id. at 97. For example, in August 2020, Garcia documented a meeting with Moye about an employee's report that Moye had been "inappropriate and unprofessional." Id. at 215. Similarly, in October 2020, Garcia documented another meeting with Moye in which Moye "became defensive" when discussing Moye's process for recruiting nurses. Id. at 213.[3]

---

[2]  While the record does not provide additional detail about these concerns, the record reflects that Moye documented that the meeting took place and that Harriger communicated concerns to her.

[3]  Moye denies that Garcia ever "met with Moye to discuss any problems with Moye's performance." Id. at 282–83. Moye offers no evidence, however, to counter or cast doubt on the reliability of Garcia's records. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for

3

Verland employees, including Garcia, also reported positive aspects of Moye's performance. In February 2020, about five months into Garcia's time at Verland, Garcia gave Moye a birthday card that complimented her work. At her deposition, Garcia testified that she thought Moye "was doing a good job" when she gave her the card, and that although she harbored some concerns about Moye's performance, she believed Moye could remedy them. Id. at 97, 373. One other Verland employee, although not Moye's supervisor, agreed when prompted at his deposition that he had no "reason to believe … that Ms. Moye was not doing her job satisfactorily," and that she had a "good work ethic." Id. at 84.

In November 2020, Moye became ill with COVID-19, and took a two-week leave of absence from November 23 to December 7, 2020. Verland has said that around that time, it discovered many deficiencies in Moye's work performance which eventually led it to develop a written "Performance Improvement Plan" ("PIP") for her. Id. at 137. Moye acknowledged that many of the incidents Verland referenced in the PIP occurred during or around the time that she was on leave and does not dispute that several of them occurred in the way Verland says they did. For other incidents, she acknowledges that they occurred, but disputes the underlying facts. For example, the PIP notes that there were "[i]ssues related to nursing documentation," which Verland viewed as Moye's "responsibility" in her "leadership role" as DON. Id. at 137, 144. Moye does not dispute

purposes of ruling on a motion for summary judgment." Scott v. Harris, 550 U.S. 372, 380 (2007). Thus, despite our deference to Moye's version of the facts on summary judgment, we accept Verland's documented evidence that these meetings occurred.

4

that documentation was missing, although she does counter that she "was off on leave" when Verland uncovered the issue. Moye Opening Br. 8.

On December 2, 2020, while she was on leave, Moye filed a claim for workers' compensation related to her illness.

Verland began work on the PIP for Moye around the time that she returned from her leave. The PIP informed Moye that "[d]uring your two week absence, many issues were brought to light regarding outstanding work and lack of prioritization" and, in its "Observations" section, the PIP identified seven concerns with Moye's performance. App. 137–39. The PIP also set out "Goals" and "Expectations" for Moye to meet. Id. at 139–41. The PIP provided Moye thirty days during which she was "expected to make regular progress on the plan outlined." Id. at 141. The PIP further specified that if Moye did not show "significant improvement," she could be "terminated prior to the 30 days." Id. As noted above, Moye disputes many of these Observations, at least in part (e.g., regarding missing documentation within her department).

Garcia and a human resources manager gave Moye the PIP during a meeting on December 16, 2020. Moye did not sign the PIP. The day after the meeting, on December 17, Garcia emailed Moye to ask her to "please sign this PIP, scan it and return it to me via email." Id. at 147. The next day, on December 18, Moye responded by email that she was "disputing the job performance review." Id. Garcia forwarded Moye's email to the chief human resources officer and suggested meeting with Harriger, saying, "since she is not acknowledging the need for improvement, at this point, I think we need to move on. Thoughts??" Id.

5

Later that day, Garcia responded to Moye's email. She again asked Moye to sign the PIP and instructed Moye that "[i]f you believe that you do not need to improve your performance, let us know in writing, and I will discuss with HR next steps." Id. at 151. Moye responded three days later, on December 21. She said that she "acknowledge[d]" and was "in receipt of the performance improvement plan," and that she was "more than willing to accept constructive criticism of [her] job performance." Id. at 150. But, as in her December 17 email, she again noted that she "disputed many of the accusations" in the PIP. Id. Moye still did not sign the PIP.

About two weeks later, on January 4 and 5, 2021, Verland documented two additional incidents involving Moye's performance.[4] On January 5, 2021, Verland documented that "[a]s of today, there has been no feedback from [Moye] on the completion of items on the PIP." Id. at 156. Verland fired Moye that same day,

---

[4] Although the parties agree that both incidents occurred, they disagree about details. These disputes ultimately have no impact on our decision. We summarize them here, however, because they reflect that Moye argues only that Verland's decisions are "wrong or mistaken," rather than showing that its explanations are "unworthy of credence," as required to create an inference of pretext. Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) (citation omitted).

In the first incident, the parties agree that Moye was supposed to call a patient's mother, that the patient's mother complained that Moye never called, and that the patient's medical record does not reflect that Moye made the call. Moye maintains that she did call and supports her claim with a note she wrote memorializing the call. In the second incident, the parties agree that it was Moye's duty to find a replacement for a sick nurse who was in charge of administering COVID tests for the staff, that staff members waited for a replacement to no avail and were not tested for COVID as a result, and that Moye did not realize this occurred until the next day. Moye asserts that she did assign a replacement and asserts that Garcia was ultimately responsible for ensuring that testing was completed.

6

approximately twenty days into the PIP review period.

Garcia testified at her deposition that when she met with Moye on that day, she told Moye that "she was being terminated for failure to improve on the expectations … [o]f her job." Id. at 93–94. Garcia also testified that those expectations included the "issues in the PIP" and "failure to meet the requirements of the PIP." Id. at 94. In a subsequent Position Statement to the U.S. Equal Employment Opportunity Commission ("EEOC"), Verland stated that it fired Moye "[a]s a result of the[] two incidents [in January 2021] as well as Ms. Moye's refusal to participate in the PIP." Id. at 163.

Moye filed the instant action, suing Verland for terminating her.[5] She claimed that Verland discriminated against her based on her race, in violation of Title VII of the Civil Rights Act of 1964, the Civil Rights Act of 1866, and the PHRA. She also claimed that Verland retaliated against her for filing a workers' compensation claim, in violation of Pennsylvania tort law.

After discovery, Verland moved for summary judgment. The District Court granted Verland's motion. It determined that Moye had not made out a prima facie case for her discrimination or retaliation claims. It also decided that, even if Moye had made out a prima facie case, Verland had given a legitimate explanation for its actions and Moye had not created a genuine dispute of material fact as to whether Verland's reasons were pretextual.

---

[5]    After filing her complaint in the District Court, Moye filed a Charge of Discrimination with the EEOC, and received a Notice of Right to Sue. Moye then filed an Amended Complaint.

7

Moye timely appealed.

II. DISCUSSION[6]

We evaluate both Moye's discrimination and retaliation claims under the burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). See Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410 (3d Cir. 1999) (applying the McDonnell Douglas framework to race-discrimination claims under Title VII, section 1981, and the PHRA).[7] Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination or retaliation. Texas Dep't of Cmty. Affs. v. Burdine, 450 U.S. 248, 252–53 (1981). If the plaintiff makes out a prima facie case, then the burden of production shifts to the employer to offer some legitimate, non-discriminatory or non-retaliatory reason for its action. Id. at 253. If the employer does so, then the burden of production returns to the plaintiff to show that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext" for discrimination or retaliation. Id.

Summary judgment is appropriate when the movant "shows that there is no

---

[6]     The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction to review the District Court's order granting summary judgment under 28 U.S.C. § 1291. We review the District Court's summary judgment decision under a plenary standard. See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist., 877 F.3d 136, 141 (3d Cir. 2017).

[7]     The District Court predicted, as other federal district courts and Third Circuit panels have, that Pennsylvania would also apply this framework to common-law retaliation claims. On appeal, both parties accept the District Court's prediction of Pennsylvania law.

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where the defendant is the moving party, the plaintiff can overcome the defendant's assertion that it is entitled to summary judgment by offering evidence that "creates a genuine issue of material fact"—that is, by providing "sufficient evidence to allow a reasonable jury to find for h[er] at trial." Brewer v. Quaker State Oil Refin. Corp., 72 F.3d 326, 330 (3d Cir. 1995). However, offering evidence that creates a genuine issue of material fact as to pretext is a "difficult burden." Fuentes, 32 F.3d at 765.

A plaintiff can meet this burden by offering evidence that "casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication."[8] Id. at 762. Put differently, a plaintiff seeking to show pretext through this route "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' and hence infer 'that the employer did not act for [the asserted] non-discriminatory [or non-retaliatory] reasons.'" Id. at 765 (first alteration in original) (emphasis omitted) (citations omitted) (first quoting Ezold v. Wolf, Block,

---

[8] Alternatively, a plaintiff can offer evidence that "allows the factfinder to infer that discrimination [or retaliation] was more likely than not a motivating or determinative cause of the adverse employment action." Fuentes, 32 F.3d at 764. For example, for a discrimination claim, the plaintiff might offer evidence that an employer discriminated against her or another in the past or treated more favorably similarly situated persons of a non-protected group. Id. at 765. Moye focuses on evidence of fabrication so we need not address this method of establishing pretext.

Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)); and then quoting Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 638 (3d Cir. 1993)). Where an employer claims to have fired an employee for performance reasons, evidence that the employer had not previously criticized the employee's performance can contribute to an inference that those reasons were "post hoc concoctions." Jackson v. Univ. of Pittsburgh, 826 F.2d 230, 234 (3d Cir. 1987).

Verland has stated that Moye was terminated for her failure to participate in the PIP and for her failure to improve on performance expectations, as evidenced by the two incidents in January of 2021 (collectively, "Verland's reasons").

Moye contends that Verland's reasons are pretextual and offers three arguments. First, as evidence of fabrication, Moye argues that Verland did not complain of her performance prior to the PIP and contests some facts related to Verland's reasons. Second, Moye states that Verland's reasons, over the course of time, have been inconsistent. Third, Moye contends that the pretextual nature of Verland's reasons is established by the fact that Verland had concerns with Moye's performance long before the PIP but did not discipline her until after she filed her workers' compensation claim. We address each of her arguments in turn below and find that Moye has not met her burden in rebutting Verland's reasons.[9]

---

[9] We will thus assume that Moye established a prima facie case of discrimination and retaliation.

10

A. There Is No Genuine Dispute that Verland Was Dissatisfied with Moye's Performance

Moye tries to cast doubt upon the legitimacy of Verland's reasons by asserting that Verland never criticized her performance before it issued her the PIP. Moye also disputes some facts related to Verland's reasons. Moye does not, however, dispute the crux of Verland's reasons: that it had concerns about her performance and that she did not cooperate with the PIP or improve (as further reflected by the two incidents in January).

1. History of Performance Concerns

The record establishes that Moye's supervisors—as well as third-party consultants to whom Moye ascribes no discriminatory or retaliatory animus—expressed concerns about Moye's performance during the year-and-a-half preceding Moye's PIP and termination. This evidence includes Moye's own note from March 2019 that Harriger warned her that her job was at stake; the report from April 2019 documenting the consultants' multiple concerns; Dr. Lund's recommendation to terminate (not just demote) Moye in August 2019; and Garcia's documented concerns about Moye in August and October 2020, including that Moye had been inappropriate, unprofessional, and defensive. While many of the concerns listed in the PIP had not previously been raised, Verland stated that it did not discover those particular concerns until just weeks earlier, around the time that Moye was on leave. Moye does not dispute, nor offer evidence that undermines, this explanation.

To counter, Moye argues that Garcia thought Moye "was doing a good job" in

11

February 2020, App. 97, and thus Verland's statement to the EEOC that her "performance declined from September 2019 until February 2020" was overblown, Moye Reply Br. 22 (citing App. 161). But Verland told the EEOC no such thing. Rather, Verland listed a series of incidents during that time when "significant risks to individuals' health and safety" occurred "under Ms. Moye's leadership." App. 161. Verland cited these incidents to demonstrate that "the issues identified by the consultants had not improved," id. (emphasis added), not that Moye's performance declined during that period. In any case, Moye does not dispute that these incidents occurred or that they were her responsibility. Moreover, Garcia's single, qualified statement that Moye was doing a "good job" in February 2020 does not create a factual dispute about these incidents.

The facts here reflect that Verland repeatedly expressed concerns with Moye's performance from at least March 2019. Although Moye gives examples of two favorable statements that Verland employees made about her performance, those pieces of positive testimony show only that Moye's performance was not wholly unsatisfactory. Unlike the cases Moye cites, Moye had a documented record of poor performance and the evidence she offers does not demonstrate such "weaknesses" or "implausibilities" as to conclude Verland's reasons were pretextual. Fuentes, 32 F.3d at 765.

### 2. Factual Disputes Raised by Moye

Moye argues that disputed facts support a genuine issue that Verland's reasons are pretextual. When a plaintiff disputes an employer's performance-related explanation, the "factual dispute at issue is whether discriminatory animus motivated the employer, not

12

whether the employer is wise, shrewd, prudent, or competent." Id. at 765. Thus, a plaintiff cannot survive summary judgment by simply responding, "Not so," to the facts underlying the employer's criticisms; rather, she must offer evidence that could allow a factfinder to find those criticisms "weak, implausible, or incredible" as explanations for her employer's action. Id. 766–67.

Moye's factual disagreements do not reach this level. For example, as noted above, Moye does not dispute that Verland found issues with documentation in her department while she was on leave. Instead, she seeks to disclaim responsibility by responding that she was on leave when Verland found the issues. But as stated in the PIP, Verland's concern was not contingent on Moye's personal presence; rather, it was that "issues were brought to light" during her absence that showed that she needed to "reiterate[]" "[c]lear expectations for documentation" to her subordinates. App. 137.[10] We agree with the District Court that factual disagreements like these raised by Moye could not cause a reasonable factfinder to conclude that Verland's reasons are "weak, implausible, or incredible," raising an inference of pretext. Fuentes, 32 F.3d at 767.

---

[10] Similarly, Moye claims that she called a patient's mother, contrary to the mother's complaint that she did not. See supra note 4. Crediting Moye's statement that she did, in fact, make the call does not satisfy her burden. Moye's real argument is that Verland should not have believed the mother's account and the medical records over her own account and note. Additionally, regardless of whether Moye made the call, her failure to log the call in the electronic system supports Verland's complaints regarding her lack of communication and documentation.

B.     <u>Verland's Reasons Are Not Inconsistent, and Thus Do Not Create a Genuine Dispute Supporting Pretext</u>

Moye also argues that Verland has given "inconsistent" reasons for terminating her, and that these inconsistencies create an inference that its reasons are pretextual. We see no such inconsistencies.

In support of this argument, Moye relies heavily on an email Garcia sent two days after Verland issued the PIP. Moye asserts the email demonstrates that Verland always intended to terminate her, whether or not she satisfied the terms of the PIP. In that email, Garcia suggested that Verland might need to "move on" because, by refusing to sign and acknowledge the PIP, Moye was "not acknowledging the need for improvement." App. 147. Even assuming that the phrase "move on" indicated a desire to terminate Moye,[11] that decision would have been predicated upon Moye's failure to "acknowledg[e] the need for improvement"—a failure Moye partially addressed[12] three days later when she acknowledged the PIP and stated that she was "more than willing to accept constructive criticism of [her] job performance." Id. at 147, 150. In addition (and again, assuming that "move on" means firing Moye), the timing of Garcia's email suggests not that Moye's firing was predetermined, but rather, that Verland did not consider "mov[ing] on" until Moye refused to participate in the PIP process. Id. at 147. We thus do not find this comment, viewed in the light most favorable to Moye, establishes such "weaknesses" or

---

[11]     "Move on" might also mean, for instance, elevate to the next level of decisionmaker. We interpret this comment in the light most favorable to Moye and take it to be a reference to terminating Moye's employment.

[12]     Moye continued to dispute some of the factual allegations in the PIP.

14

"implausibilities" such that a reasonable factfinder could conclude Verland's reasons are "unworthy of credence." Fuentes, 32 F.3d at 765 (citation omitted).

Moye also contends that Verland's statement to the EEOC that it fired her, in part, because of the two incidents in January is inconsistent with deposition testimony that she was fired for failing to meet PIP requirements. But Verland told the EEOC that it fired Moye for both of these reasons. Nor are these reasons inconsistent with each other. The common thread in all of the statements is that Verland fired Moye for failing to improve her deficient job performance.

C.      The Timing of Moye's Termination Does Not Create a Genuine Dispute
         that Verland's Reasons Are Pretextual

With respect to her state-law retaliation claim, Moye argues that even if Verland did have longstanding concerns about her performance, the fact that Verland did not fire her until after she filed for workers' compensation suggests that those reasons are mere pretext for Verland's true retaliatory motive. While an employer's "belated reliance" on pre-existing criticisms can evince pretext, Brewer, 72 F.3d at 332, Moye offers no evidence of belated reliance here. As noted above, Verland has stated that it only discovered many of the concerns in the PIP while Moye was on leave in November and December 2020. Moreover, Verland stated that it fired Moye because of concerns that arose in the final weeks of her employment: Moye's refusal to cooperate with the December 2020 PIP (which itself was prompted by issues recently discovered), and Moye's continued performance problems in January 2021. Thus, although Verland had concerns about Moye's performance for some time before it fired her, the specific

15

concerns that it says led to Moye's firing are meaningfully different than those past issues and we find no basis to infer these reasons are pretextual.

III.    CONCLUSION

In sum, Moye fails to carry her burden of offering evidence that could allow a factfinder to rationally determine that Verland's offered reasons for terminating her are pretext for discrimination or retaliation.  Accordingly, we conclude that Moye failed to show pretext.

For the foregoing reasons, we will affirm the District Court's order.